**In re ADOPTION OF W.J.R., a Minor Child**

**Appeal of W.A.R., Natural Father, Appellant.**

Superior Court of Pennsylvania.

Submitted April 21, 2008.

Filed June 20, 2008.

Margaret G. Gold, Cabot, for appellant.

Karen E. Koskoff, Pittsburgh, for appellee.

Alexandra Gruskos, Pittsburgh, for Allegheny County Children and Youth, Participating Party.

BEFORE: STEVENS, BOWES, JJ., and McEWEN, P.J.E.

OPINION BY STEVENS, J.:

¶ 1 W.A.R. (Father) appeals from the order of the Allegheny County Court of Common Pleas terminating his parental rights to his child, W.J.R.[1] We affirm.

¶ 2 This Court previously set forth the factual background and procedural history of this case as follows.

Father and K.H. (Mother) are the parents of W.J.R. who was born on February 17, 1997. Allegheny County Children Youth and Family (CYF) became involved with W.J.R. on March 6, 2003.[2] At that time, paternal grandmother contacted CYF and informed them that the child was in her care and that Father was a fugitive. Based upon allegations by the paternal grandmother, a restraining order was also entered against both parents on March 6, 2003. By order entered March 7, 2003, the child was placed with paternal grandmother. On March 28, 2003, the child was adjudicated dependent. Thereafter, on June 28, 2003, the child was removed from paternal grandmother's care and placed in foster care where he remains to date.[3]

Following the child's placement, CYF caseworker Daniel Osterhos indicated he conducted a diligent search but was unable to locate Father. Unbeknownst to CYF, however, Father had been incar-

---

1. The trial court terminated the parental rights of the child's mother in the order entered on February 9, 2005. The termination of the mother's parental rights is not at issue in this appeal.

2. We note that CYF initially became involved in August of 1999 due to neglect, housing issues, and drug and alcohol issues with Mother. Apparently, the child was placed with Father.

3. Paternal grandmother had alleged that she and the child were sexually abused by individuals in her neighborhood. However, those allegations were investigated and determined to be untrue. CYF caseworker Osterhos also testified that on certain occasions, the agency was concerned about paternal grandmother's truthfulness. N.T. Hearing, 1/25/05, at 25–26.

cerated in the Allegheny County Jail since April 16, 2003. As a result of information received from paternal grandmother, on November 12, 2003, aggravating circumstances of abandonment were found, and the goal was changed from reunification to adoption. On November 24, 2003, paternal grandmother notified CYF about Father's incarceration. On May 5, 2004, CYF filed a petition to terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). Father was released from prison on November 17, 2004. On January 25, 2005, the trial court held a hearing on the termination petition.

\* \* \*

On February 9, 2005, the trial court entered an order terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8). The trial court found that CYF had not met its burden with respect to § 2511(a)(1), (2) or (5). . . .

*In re: W.J.R.*, 319 WDA 2005 at 1–2, 10, 888 A.2d 15 (Pa.Super.2005) (footnotes in original) (unpublished memorandum).

¶ 3 On appeal, this Court reversed the trial court's order and remanded the matter because the trial court relied solely on Father's incarceration, and failed to consider whether Father cooperated with CYF or met the goals set forth in the Family Service Plan (FSP) during his period of incarceration. *Id.* at 14–15. Upon remand, on March 9, 2006, the trial court ruled that CYF failed to establish by clear and convincing evidence that Father failed to cooperate with CYF or failed to meet his FSP goals during his period of incarceration. Accordingly, the trial court dismissed CYF's first termination petition.

¶ 4 In February of 2006, as part of the dependency proceedings, the goal for W.J.R. was changed to adoption. N.T., 2/27/07, at 6–7. Moreover, as part of the dependency proceedings, the trial court learned that Father was again incarcerated. *Id.* at 7. Pursuant to a plea agreement, Father was incarcerated for three to eight years for the offenses of possession of a firearm, possession of a controlled substance, possession with intent to deliver a controlled substance, and possession of drug paraphernalia. *Id.* at 9–10. Father was charged with the offenses on July 25, 2005. *Id.* at 10. His earliest release date on parole is December of 2008. *Id.*[4]

¶ 5 On July 10, 2006, CYF filed a second petition for involuntary termination of Father's parental rights. The trial court held hearings on the second petition on February 27, 2007 and May 29, 2007. On May 29, 2007, the trial court entered an order terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Father filed a timely appeal on June 27, 2007. On July 5, 2007, the trial court issued an order directing Father to file a Concise Statement of Matters Complained of on Appeal, pursuant to Pa. R.A.P.1925(b), within fourteen days, and Father timely complied. The trial court filed a Pa.R.A.P.1925(a) opinion.

¶ 6 On appeal, Father raises two issues as follows:

1. Did the trial court err when it ruled that grounds for involuntary termination of [Father's] parental rights under 23 Pa.C.S. § 2511(a)(2), (5), and (8) had been proven by clear and convincing evidence?

2. Did the trial court err in considering the question of whether termination of

---

4. The trial court acknowledged a possibility that Father could be released to a halfway house, where he would not be able to have

the child, as of June of 2007. Trial Court Opinion, 8/23/07, at 8.

[Father's] parental rights best serves the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b) when [CYF] failed to present clear and convincing evidence that grounds for involuntary termination existed pursuant to § 2511(a) and erred in answering in the affirmative when [CYF] failed to meet its burden of proving by clear and convincing evidence that involuntary termination of Father's parental rights would best meet the developmental, physical and emotional needs and welfare of the child?

Father's Brief at 6.

■ ¶ 7 Our standard of review regarding orders terminating parental rights is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa.Super.2005) (quotation omitted). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *Id.* at 806.

¶ 8 We have previously stated:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re J.L.C.*, 837 A.2d 1247, 1251 (Pa.Super.2003).

■ ¶ 9 The statutory bases for termination are as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an Agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and

termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsections (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511 (emphasis in original). "[W]e need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In Re B.L.W.*, 843 A.2d 380, 384 (Pa.Super.2004) (*en banc*) (citations omitted).

¶ 10 The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73–74 (Pa.Super.2004). If competent evidence supports the orphans' court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super.2003).

¶ 11 In his interrelated issues, Father contends that CYF failed to sustain its burden of proving that his parental rights should be terminated pursuant to subsections 2511(a)(2), (5), (8), and (b). Regarding subsection 2511(a)(2), Father alleges that he did everything possible to maintain a relationship with W.J.R., but his incarceration imposed limitations on him. Regarding subsections 2511(a)(5) and (8), Father contends that the trial court's "real basis" for terminating his parental rights was the fact that he is incarcerated. Essentially, Father argues that the trial court improperly focused its analysis on the fact that he is incarcerated. Regarding subsection 2511(a)(2), Father asserts that he desired to maintain contact with W.J.R., and he expressed that desire by sending W.J.R. letters and requesting visits with the child.

¶ 12 Father also urges that the trial court's needs and welfare analysis under subsections 2511(5) and (8), and its bond-effect analysis under subsection 2511(b), were deficient. Father claims that CYF should have provided the court-appointed psychological evaluator, Dr. Cathy Sigmund, with information concerning Father's primary caretaking of W.J.R. during the first five years of the child's life.

¶ 13 At the hearing on the termination petition held on February 27, 2007, the trial court heard testimony from Frank Petras, who is a casework supervisor with CYF; Kenny Roberson, who is a foster care worker for Wesley Spectrum Services; Greg Netel, who is a CYF caseworker; and Father. N.T., 2/27/07, at 4, 66–67, 73–74, 90, and 130. At the hearing held on May 29, 2007, the trial court heard testimony from Dr. Cathy Sigmund, the

court-appointed psychological evaluator; Father; and Frank Petras. N.T., 5/29/07, at 19, 71, and 73.

¶ 14 Mr. Petras testified that the FSP goals, which CYF set for Father in April of 2006, consisted of: 1) improving the parent-child relationship; 2) being placed in a drug and alcohol program; 3) receiving mental health services, if needed; 4) maintaining contact and completing parenting classes; and 5) resolving his criminal issues. N.T., 2/27/07, at 11–14. Mr. Petras testified that Father's only action with regard to improving the parent-child relationship consisted of sending three or four letters to the CYF caseworker and two letters to his child. Id. at 15, 22–23. Mr. Petras did not receive any documentation that Father had completed his drug and alcohol goal. Id. at 15. Moreover, Mr. Petras testified that, because there was a history of mental health problems in Father's family, CYF had sought to establish that Father had no mental health problems. Id. at 22.

¶ 15 Regarding Father's goal of rehabilitation from criminal activities, Mr. Petras testified that Father's arrest and guilty plea on the drug and firearms charges indicated that Father's participation in programs while he was previously incarcerated had not rehabilitated him from his life of criminal activities and involvement with drugs. Id. at 63–65. Further, Mr. Petras testified that Father had not completed any of his FSP goals, and that CYF had serious concerns about Father's ability to parent W.J.R. because the child was in placement for forty-six months at the time of the hearing. Id. at 23–24. Mr. Petras indicated CYF is concerned that Father's criminal activity had spanned the time period since the removal of the child in March of 2003. Id. at 24, 62–64.

¶ 16 Greg Netel testified that he developed the FSP plan for Father. Id. at 74.

Mr. Netel also testified that he received the four letters which Father sent from prison regarding W.J.R. Id. at 83.

¶ 17 Mr. Roberson testified that he works with W.J.R. in school and in the community. Id. at 67. Mr. Roberson stated he observed W.J.R. with the foster parents on a weekly basis for three years, and he observed that W.J.R. is affectionate with the foster parents and refers to them as "Mom" and "Dad." Id. at 68, 71. Mr. Roberson testified the foster parents provide a stable family for W.J.R., are bonded with him, and are committed to adopting him. Id. at 68, 70–71, 76. Further, Mr. Roberson stated that the foster parents provide for W.J.R.'s developmental, emotional, and physical needs. Id. 72. At the hearing on May 29, 2007, Mr. Roberson testified that he took W.J.R. to the jail to visit Father on three occasions. N.T., 5/29/07, at 130. On the first visit, Mr. Roberson could not be present; on the second, W.J.R. cried when he left the jail; and, on the third, W.J.R. did not wish to see Father. Id. at 130–131.

¶ 18 At the hearing on May 29, 2007, Dr. Sigmund testified that, in the spring of 2007, she conducted an interactional evaluation of W.J.R. and his foster parents, as well as an individual evaluation of W.J.R. N.T., 5/29/07, at 19–22, 33. She believes that the foster parents stimulate the child's education and provide for his emotional needs, and that a warm, strong bond has developed over the past four years. Id. at 22–25, 28–33. Dr. Sigmund also concluded that W.J.R. required stability in view of his mental health problems and behavioral problems. Id. at 34. Dr. Sigmund also opined that Father has an unstable relationship with W.J.R., and his release on parole to a halfway house would not present an environment to raise the child. Id. at 38–40, 44. She believed that W.J.R.'s need for permanency would be

better served by terminating Father's parental rights and permitting W.J.R. to be adopted by his foster parents. *Id.* at 33–35.

¶ 19 Father admitted that his criminal activity could jeopardize his relationship with W.J.R. and the court. *Id.* at 99–100. Father acknowledged that he was convicted for selling illegal drugs, but he maintained that he does not have a "drug problem" because he allegedly does not use drugs. *Id.* at 95–98, 101–103. Nevertheless, Father stated that he would complete a drug and alcohol program at prison to satisfy his FSP. *Id.* at 103. Father represented that his criminal activities should not reflect adversely on his parenting ability because W.J.R. was not present during his criminal activity. *Id.* at 104. Father testified he was completing an associate's degree in prison, and he planned to secure employment and send W.J.R. to school when he is released from prison. *Id.* at 115, 123. Father also testified that he could be released to a halfway house in June of 2007 until his minimum sentence was completed in December 2008. *Id.* at 115, 125–126. Father testified that the only contact he had attempted to maintain with W.J.R. was sending him letters. *Id.* at 122–123.

¶ 20 Recently, a panel of this Court considered the implication of the incarceration of a parent and the trial court's bond-effect analysis in *In re I.G.*, 939 A.2d 950 (Pa.Super.2007), stating:

> Incarceration alone is not sufficient to support termination under any subsection. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super.2000) (*en banc*) . . . . "[P]arental responsibilities are not tolled during incarceration." *In re: D.J.S.*, 737 A.2d 283, 286 (Pa.Super.1999). "A parent desiring to retain parental rights must exert himself to take and maintain a place of importance in his child's life." *Adoption of Baby Boy A.[ v. Catholic Social Services of the Diocese of Harrisburg, Pennsylvania, Inc.*], 512 Pa. 517, 517 A.2d 1244, 1246 (Pa.1986) . . . .
>
> Further, with respect to failure to perform parental duties under subsection (a)(1), as well as incapability under subsection (a)(2), incarceration alone cannot support termination. A parent's absence and failure to support a child due to incarceration is not conclusive on the issue of whether the parent has abandoned the child. This Court and the Pennsylvania Supreme Court have repeatedly held as much. *See, e.g., Adoption of Baby Boy A., [supra]; In re D.J.S.*, 737 A.2d 283 (Pa.Super.1999); *Matter of Adoption of C.A.W.*, 453 Pa.Super. 277, 683 A.2d 911 (1996); *In Interest of J.E.S.*, 365 Pa.Super. 291, 529 A.2d 514 (1987); *In re Adoption of M.J.H.*, 348 Pa.Super. 65, 501 A.2d 648 (1985). Nonetheless, . . . a parent's responsibilities are not tolled during incarceration, and therefore we must inquire whether the parent utilized those resources available while he or she was in prison to continue a close relationship with the child. *Adoption of Baby Boy A., supra; In re D.J.S., supra; In Interest of J.E.S., supra* . . . .

*In re I.G.*, 939 A.2d at 953–54. *See In re E.A.P.*, 944 A.2d 79, 83 (Pa.Super.2008) (discussing incarceration as it relates to subsection 2511(a)(2), and specifically holding "a parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize given resources *and* to take affirmative steps to support a parent-child relationship.") (italics in original).

¶ 21 In *In re I.G.*, the panel concluded that the facts did not clearly establish that termination of the father's parental rights under subsections (a)(1) and (2) was warranted, as the father had voluntarily

placed his children because of his housing situation, and the father had worked two jobs and had paid child support when the mother had the children. The panel also found significant that, prior to his incarceration period, the father had visited the children each day on his lunch break from work. Additionally, with regard to subsection (b), the panel noted that the evidence of record suggested that a bond might, in fact, exist. *Id.* at 958.

¶ 22 In the present appeal, the trial court found credible Mr. Petras' testimony that Father failed to satisfy any of his FSP goals. The trial court ruled that Father's repeated pattern of criminal activity has made him incapable of parenting W.J.R. The trial court reasoned that Father's continued incarceration and resulting unavailability to parent W.J.R., along with Father's refusal to comply with drug treatment and other FSP goals, demonstrated incapacity, abuse, neglect, or refusal which caused W.J.R. to be without essential parental care. Further, the trial court found that Father, through his conduct of being re-arrested and pleading guilty to drug and firearms charges after the restoration of his parental rights in March of 2006, showed his unwillingness or inability to remedy these conditions.

¶ 23 The trial court stated that Father attempted to continue contact with W.J.R. by writing letters to the CYF caseworker and the child. The trial court explained that it denied the petition for termination under subsection 2511(a)(1) because Father demonstrated his desire to have contact with W.J.R. despite his incarceration. The trial court, however, found that Father's desire to maintain contact with W.J.R. was insufficient to satisfy the requisites for termination under subsections 2511(a)(2), (5), (8), and (b).

¶ 24 Father relies on *In re S.M.*, 816 A.2d 1117 (Pa.Super.2003), to support his argument that his parental rights should not be terminated where he has "tried every avenue to maintain contact with CYF and his son and to get involved in programs." Father's Brief at 20–21. In *In re S.M.*, the trial court terminated the father's parental rights to his daughter, pursuant to subsections 2511(a)(2), (5), (8), and (b), because of the father's repeated relapses into the use of illegal drugs. The daughter was in the care of the father's paramour, as her foster mother, who provided a nurturing and loving home which the father continued to visit and participate in as a family member. On appeal, this Court held that the trial court erred in speculating that the father might remove the child from the care of her foster mother. The panel pointed out that the trial court stated its desire that, after the termination, the foster mother would continue to allow the father to have a strong and loving relationship with her father. The panel found no facts which would support that termination of the father's parental rights was in the best interests of the child. *In Re S.M.*, 816 A.2d at 1124–25.

¶ 25 The circumstances in *In re S.M.* are distinguishable from the facts in the instant case. In the present case, the trial court found that W.J.R.'s foster parents provide him with the stable home which does not include Father. Further, unlike the situation in *In re S.M.*, the trial court found that Father cannot provide W.J.R. with the permanence he needs for his emotional and behavioral health.

¶ 26 Regarding subsection 2511(a)(2), the trial court found that Father's repeated pattern of criminal activity and his failure to comply with his FSP goals satisfies the requisites of incapacity, abuse, neglect or refusal of the parent. With regard to subsections 2511(a)(5), (8), and (b), the trial court stated that W.J.R. was removed from Father's care since

March of 2003, for a total period of three years at the time of the filing of the second petition for termination in June of 2006. Thus, the trial court found that the requisite time periods set forth in subsections 2511(a)(5) and (8) were satisfied.

¶ 27 Regarding subsections 2511(5) and (8), the trial court also found that the conditions which led to the removal of W.J.R. were Father's criminal activity and resultant inability to parent the child because of his criminal lifestyle and fugitive status, these conditions continued to exist, and Father failed to meet his FSP goals. Although Father asserted he could be pre-released from prison and sent to a halfway house in June of 2007, the trial court stated that Father could not have child live with him. Accordingly, the trial court found Father cannot or will not remedy those conditions within a reasonable period of time, and the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time.

¶ 28 The trial court also determined that, under subsections 2511(5) and (8), the termination of Father's parental rights would best serve W.J.R.'s needs and welfare, physically, mentally, and emotionally. Finally, pursuant to the bond-effect analysis under subsection 2511(b), the trial court found that W.J.R. has a strong bond with his foster parents. The trial court found that W.J.R. has a need for stability, and, if W.J.R. has contact with Father, it will cause him emotional trauma and uncertainty. *In re E.A.P.*, 944 A.2d at 83 ("Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.").

¶ 29 After our careful review, we find that the trial court's credibility determinations are supported by the record. We conclude the trial court properly found the factors for termination pursuant to subsections 2511(a)(2), (5), (8), and (b) were satisfied by clear and convincing evidence. Accordingly, we affirm the order terminating Father's parental rights.

¶ 30 Order affirmed.