J-S31001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.A.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3355 EDA 2017 |

Appeal from the Order Entered September 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000866-2017,
FID-51-FN-000971-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: S.K.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.A.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3358 EDA 2017 |

Appeal from the Order Entered September 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000868-2017,
FID-51-FN-000971-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: K.-S.K.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.A.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3359 EDA 2017 |

J-S31001-18

Appeal from the Order Entered September 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000867-2017,
FID-51-FN-000971-2015

BEFORE: SHOGAN, J., LAZARUS, J., and DUBOW, J.

MEMORANDUM BY SHOGAN, J.: **FILED JULY 16, 2018**

T.A.P. ("Mother") appeals from the orders involuntarily terminating her parental rights to her children: S.S.P., born in December of 2007, K.-S.K.P., born in September of 2009, and S.K.P., born in September of 2015 (collectively "the Children"). After careful review, we affirm.

The trial court set forth the following factual and procedural history:

> On February 17, 2015, the Department of Human Services (DHS) received [a] General Protective Services (GPS) report which alleged that S.K.P., [K.-S.K.P.,] and their siblings resided with their mother and Maternal great-grandmother in a home without heat or electricity. It was alleged that Mother had never paid the electric bill and the electricity had been shut off twice. Mother allegedly had the electricity re-connected illegally. It was alleged that on February 7, 2015, the Philadelphia Electric Company (PECO) removed the wiring to the home to ensure that an illegal electrical hook-up was not possible. It was alleged that the home was heated by electricity and Mother was using the gas range to heat the home. It was alleged that PECO stated that they would never provide electricity to Mother again. The report was substantiated.

> On or around February 18, 2015, DHS visited the home located [on South Bambrey Street]. There was no heat or electricity in the home, and the ceiling in the kitchen and bathroom was falling. DHS determined that S.S.P. [and K.-S.K.P.] were not safe in the home. Paternal Aunt of the children allowed Mother to reside with her. A Safety Plan was implemented in the home of Paternal Aunt.

- 2 -

On or around March 11, 2015, DHS learned that Mother left the home of Paternal Aunt with S.S.P. and [K.-S.K.P.]. Their whereabouts became unknown.

On March 12, 2015, DHS learned that the family was residing at an emergency shelter. DHS visited the family and implemented a Safety Plan with the shelter's operator. Mother stated that she was uncomfortable in the home of Paternal Aunt. Mother stated that she had given money and food to Paternal Aunt as a form of rent. Mother also alleged that when the food stamps ran out, [Paternal Aunt] would not cook or feed the children.

Mother began receiving direct service from the Community Umbrella Agency (CUA) Bethanna. CUA began to help Mother with negotiating a payment plan with PECO for her $7,000.00 outstanding bill.

CUA learned that Mother failed to follow up with the CUA outreach specialist in order to obtain assistance with her PECO bill. CUA also learned that Mother returned to the shelter after a curfew on a consistent basis. Curfew was 8:00 p.m. and Mother would arrive at the shelter with [S.S.P. and K.-S.K.P.] anywhere between 9:00 p.m. and 11:00 p.m.

[From late March through April 7, 2015, Mother and S.S.P. and K.-S.K.P. moved from shelter to shelter. Mother was denied entry to several shelters due to positive drug screens and also voluntarily left a shelter before she could be drug tested.]

* * *

On April 7, 2015 Mother[,] S.S.P., [K.-S.K.P.], and Paternal Aunt returned to the residence of Great Grandmother. Great Grandmother signed a Safety Plan for S.S.P. and [K.-S.K.P.].

Mother stated that she has been diagnosed as suffering from major depression and anxiety; however, Mother did not receive any mental health treatment.

On May 13, 2015, an initial Single Case Plan (SCP) was created. The objectives for Mother were to provide the children with a safe environment and adequate living conditions; to follow up with PECO regarding her outstanding bill; to look for/locate her lease; to get up on time and prepare the children for the day; to

take S.S.P. to school daily and on time; to explore transferring S.S.P. to another school; and to ensure the safety, well-being, and all basic needs, including physical, mental, educational and emotional needs are being met for the children.

At the Adjudicatory Hearing held on May 19, 2015 for S.S.P. and [K.-S.K.P.], the court adjudicated the children dependent, committed them to DHS, ordered Mother to move out of the home of the children's Maternal Great-Aunt, referred Mother to the Clinical Evaluation Unit (CEU) for an assessment, a forthwith screen with dual diagnosis, and monitoring, ordered Mother to sign all necessary releases, and ordered Mother to comply with CUA.

On May 19, 2015, Mother tested positive [for] benzodiazepines and THC.

On June 5, 2015, Mother did not attend her scheduled appointment at CEU.

On August 17, 2015, it reported that there had been minimal compliance with the permanency plan by Mother and that Mother had not been consistently attending Al-Assist. The Court re-referred Mother to CEU for a forthwith drug screen and a dual diagnosis assessment.

On September 8, 2015, DHS received a GPS report which alleged that Mother tested [positive] for marijuana at S.K.P.'s birth [in early] September [of] 2015. The report alleged that S.K.P. tested negative for drugs at birth; that two weeks earlier, Mother had tested positive for benzodiazepines; and that Mother had tested positive for benzodiazepines and marijuana during other prenatal visits. The report alleged that S.K.P. was born at 32 weeks and four days gestation; that she weighed 3.2 pounds at birth. S.K.P. was monitored in the Neonatal Intensive Care Unit (NICU). The report also alleged that S.K.P. was not showing symptoms of drug withdrawal, was being monitored for benzodiazepine exposure; and that S.K.P. might be ready for discharge from the hospital in the next three weeks. It was alleged that S.K.P.['s] sibling lived with her Father. [I]t was alleged that Mother suffered from anxiety and depression and took medication prior to her pregnancy. Mother was supposed to be [attending] mental health and drug and alcohol treatment at Al-Assist. However, she had not [attended] treatment. It was

- 4 -

further alleged that Mother did not know the identity of S.K.P.'s father and that her pregnancy had been the result of rape. The report alleged that Mother received Temporary Assistance for Needy Families (TANF) benefits; that she had Keystone health insurance. The report alleged Mother received prenatal care at Women and Children's Health Services at Pennsylvania Hospital. The report was substantiated.

On September 29, 2015, S.K.P. was ready for discharge from Pennsylvania Hospital. DHS obtained an Order of Protective Custody (OPC) for S.K.P. and she was placed in foster care through Bethanna. At the Shelter Care Hearing for S.K.P., held on October 1, 2015, the Court lifted the OPC and ordered the temporary commitment to DHS to stand.

* * *

At the Adjudicatory Hearing held for S.K.P. on October 29, 2015, the [c]ourt discharged the temporary commitment; adjudicated S.K.P. dependent; committed her to DHS; referred Mother to CEU for a dual diagnosis assessment, monitoring, a forthwith drug screen and three random screens prior to the next court date; ordered Mother to sign releases and comply with all recommendations; referred Mother to [B]ehavioral Health System (BHS) for trauma therapy and referred Mother to the Achieving Reunification Center (ARC) for housing and appropriate services.

On February 2, 2016, it was reported that there had been minimal compliance with the permenancy plan by Mother, that Mother was not engaged at the ARC. The Court referred Mother to CEU for a forthwith drug screen, an assessment and three random drug screens prior to the next court date.

On April 19, 2016, it was reported that there had been minimal compliance with the permanency plan by Mother. Mother tested positive for marijuana. The [c]ourt referred Mother to CEU for a forthwith screen, an assessment with dual diagnosis, and three random drug screens prior to the next court date.

[Mother tested positive for alcohol and marijuana on May 2, 2016, May 31, 2016, and June 31, 2016.]

* * *

On July 1, 2016, Mother did not attend her scheduled assessment appointment at CEU.

On July 1, 2016, Mother tested positive for marijuana.

On July 13, 2016, Mother did not attend her re-scheduled assessment appointment at CEU.

On August 17, 2016, The [c]ourt referred Mother to BHS for monitoring and a Parent Capacity Evaluation.

On January 9, 2017, a revised SCP was created. The objectives for Mother were to provide the children with a safe environment and adequate living conditions; to follow-up with PECO regarding her outstanding bill; to make her whereabouts known to the Bethanna case manager and maintain contact with the case manager throughout the life of the case; to obtain housing suitable for reunification; to re-engage with treatment at Al-Assist or request to be connected to another agency for treatment; to attend Al-Assist as recommended consistently to address her history of drug and alcohol abuse; to follow-up with individual therapy as recommended on a consistent basis; to apply for Supplemental Security Income (SSI) to address anxiety and depression; to comply with court-ordered stipulations of visitation; to follow-up with the referral for parenting education; to comply with the court ordered Parenting Capacity Evaluation; to connect with the Bethanna case manager regarding services receive[d]; to follow-up with domestic violence counseling at Al-Assist.

On January 24, 2017, the [c]ourt referred Mother to CEU for monitoring.

On March 28, 2017, it was reported that there had been no compliance with the permanency by Mother. The [c]ourt referred Mother to CEU for a drug screen, monitoring and three random drug screens.

On March 28, 2017, Mother tested positive for cannabis.

On June 16, 2017, it was reported that there had been minimal compliance with the permanency plan by Mother. It was reported Mother refused to sign Voluntary Relinquishment of Parental Rights forms, did not have adequate housing, and had

not completed the second part of the Parenting Capacity Evaluation.

On August 25, 2017, a revised SCP was created. The objectives for Mother were to provide the [C]hildren with a safe environment and adequate living conditions; to follow-up with PECO regarding her outstanding bill; to obtain housing that [is] suitable for reunification and provide CUA with a copy of the lease; to attend Al-Assist, as recommended, consistently to address her substance abuse and mental health; to apply for SSI to address anxiety and depression; to comply with court-ordered stipulations of visitation; to follow-up with her referral for parenting education; to comply with part two of the court ordered Parenting Capacity Evaluation; and to follow up with domestic violence counseling at Al-Assist.

The matter was [then] listed on a regular basis before judges of the Philadelphia Court of Common Pleas, Family Court Division-Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351, and evaluated for the purpose of reviewing the permanency plan of the [Children].

In subsequent hearings, the Dependency Review Orders reflect the [c]ourt's review and disposition as a result of evidence presented, primarily with the goal of finalizing the permanency plan.

On September 12, 2017, during the Termination of Parental Rights Hearing for Mother, the [c]ourt found by clear and convincing evidence that Mother's parental rights, should be terminated pursuant to the Juvenile Act. Furthermore, the [c]ourt held it was in the best interest of the [C]hildren that the goal be changed to Adoption.

Trial Court Opinion, 1/23/18, at 1–5. Mother filed a timely appeal.

Mother presents the following three issues for our review:

1. Whether the Trial Court erred in [t]erminating [Mother's] Parental Rights under 23 Pa.C.S.A. section 2511(a)(1), the evidence having been insufficient to establish Mother had evidenced a settled purpose of reli[n]quishing her parental claim, or having refused or failed to perform parental duties.

- 7 -

2. Whether the . . . evidence was sufficient to establish that [Mother] had refused or failed to perform parental duties, caused [the Children] to be without essential parental care, that conditions having led to placement had continued to exist, or finally that any of above could not have been remedied.

3. Whether the [e]vidence was sufficient to establish that [t]ermination of [p]arental [r]ights would best serve the [n]eeds and [w]elfare of [the Children], under 23 Pa.C.S. section 2511(b).

Mother's Brief at 5.

We review Mother's issues according to the following standard:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests

of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the court terminated Mother's parental rights pursuant to Section 2511(a)(1),(2),(5), (8), which provide as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(1),(2),(5), and (8).   This Court "need only agree with the trial court's decision as to any one subsection in order to affirm the termination of parental rights." *In re Adoption of W.J.R.*, 952 A.2d 680, 684 (Pa. Super. 2008) (quoting *In Re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004)(*en banc*)).

In her first issue, Mother argues that evidence was not sufficient to establish that she refused or failed to perform her parental duties or that she evidenced a settled purpose of relinquishing her parental claim.  Mother's Brief at 11.  In support of her argument, Mother cites to factually distinct cases and asserts that "[a]n affirmative indication of positive intent to sever the parental relationship is required in order for involuntary termination to be upheld." *Id*. at 12.  Mother then avers that because she attended four of the prior six visits with the Children, the evidence is insufficient to establish that Mother relinquished her parental claim.  *Id*.  We consider the trial court's analysis within the scope of Section 2511(a)(1).

Pursuant to the language contained in 23 Pa.C.S. § 2511(a)(1), termination of parental rights is proper where a parent has evidenced a settled purpose of relinquishing her parental claim to a child or has refused or failed

- 10 -

to perform parental duties. ***See In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) ("Section 2511 does not require that the parent demonstrate **both** a settled purpose of relinquishing parental claim to a child **and** refusal or failure to perform parental duties") (emphases added). If this Court finds that Mother has failed to perform her parental duties, we then invoke the following three lines of inquiry "(1) the parent's explanation for his or her conduct; (2) the post abandonment contact between the parent and child; and (3) consideration of the effect of termination pursuant to Section 2511(b)." ***Id.*** at 790.

In its opinion, the trial court found that Mother has failed to perform her parental duties as required by Section 2511(a)(1). Trial Court Opinion, 1/23/18, at 6. After the Children were removed, Mother was given a Single Case Plan, which set forth the following objectives, *inter alia*: obtain safe housing for the Children, attend court ordered visitation, receive mental health treatment, receive drug and alcohol treatment, receive domestic violence counseling, and attend parenting classes. *Id*. During the Goal Change/Termination hearing, Mother's social worker, Mr. Giovanni Antoine, testified that Mother has failed to complete a course of treatment for her drug abuse, and at her most recent drug screen Mother tested positive for opiates, benzodiazepine, and marijuana. N.T. (Termination), 9/12/17, at 16. Mother was referred to a dual-diagnosis treatment center to assist with her mental health and substance abuse issues, but has attended only ten of the eighty-

two sessions that were offered. *Id*. at 19. When asked what she had learned from her treatment thus far, Mother responded, "Not a thing." *Id*. at 67. Mother also has failed to secure adequate housing for the Children, despite the fact that housing was an initial objective of the case.

"There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of the child. A child needs love, protection, guidance and support." *In re Z.P.*, 994 A.2d 1108, 1118–1119 (Pa. Super. 2010). This Court has held, "Where the child is in foster care, this affirmative duty requires the parent to work towards the return of the child by cooperating with the Agency to obtain rehabilitative services necessary for him to be capable of performing his parental duties and responsibilities." *In re G.P.-R*, 851 A.2d 967, 977 (Pa. Super. 2004). As the trial court found, during the two-plus years the Children have been in DHS's care, "[Mother's] Single Case Plan objectives of drug and alcohol and mental health [treatment] remained the same and lacked progress due to difficulty." Trial Court Opinion, 1/23/18, at 7.

Moreover, we find that Mother failed to offer any reason for her failure to secure housing or participate in or complete treatment for her mental health and substance abuse issues, although she does express that those three objectives would be the most difficult to complete. N.T. (Termination), 9/12/17, at 66. As for post-abandonment contact, we note that Mother was unable to progress to unsupervised visitation, and her visits were reduced

from weekly to biweekly. *Id*. at 16, 45. Mother was consistently late for visitation despite knowing that her tardiness could result in an end to the visit and Mother was a "no call no show" on one third of the offered visits. *Id*. at 16–18. Finally, we note that that Mother whispered in the Children's ears during their visits, after being repeatedly told not to do so. *Id*. at 17. Specifically, after one visit, S.S.P. told her social worker that "Mommy told me that she won the case against DHS and that she's getting a job and that I'm going to be with her soon." *Id*. Given the fact that Mother has provided no concrete reason for her failure to comply with the objectives that she find suitable housing and address her mental health and substance abuse issues over the entirety of this action, we are constrained to find that the trial court did not abuse its discretion in terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1).

In her second issue, Mother asserts that the trial court erred because the evidence was not sufficient to establish that Mother had refused or failed to perform parental duties, caused the Children to be without essential parental care, and that conditions that led to placement continue to exist or that any of the above could not be remedied. Mother's brief at 13. Although Mother completed parenting, anger management, and domestic violence classes, Mother has failed to secure adequate housing, has continuously tested positive for controlled substances, and has failed to complete or even meaningfully participate in substance abuse and mental health treatment.

N.T. (Termination), 9/12/17, at 19, 41. We further note that Mother repeatedly stated that she believed that DHS was not attempting to help her and that DHS's goal was adoption of the Children, despite numerous conversations with DHS employees who attempted to correct Mother's misbelief. *Id*. at 20. For the reasons discussed in response to Mother's first issue and those set forth immediately above, we find that the trial court did not abuse its discretion when it terminated Mother's parental rights.

Finally, in her third issue, Mother asserts that the evidence was insufficient to support a finding that the termination of Mother's parental rights would best serve the needs of the Children as required under 23 Pa.C.S. § 2511(b), which states:

> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). Pursuant to Section 2511(b), this Court must analyze whether termination is in the best interests of the Children. *In re L.M.*, 923 A.2d at 511. "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." *In re K.Z.S.*, 946 A.3d 753, 760 (Pa. Super. 2008). This Court will also look to the

bond between the child and parent and determine the impact that termination of the parental relationship would have on the child. *Id*.

In support of this issue, Mother asserts that there has not been sufficient exploration of the impact termination would have on the Children. Mother's Brief at 15. Mother avers that the statutory language requires a best-interest standard and argues that a statement made by S.S.P. to her social worker relaying that Mother told her she won the case against DHS so that S.S.P. would be returning to Mother's care soon is evidence that termination is against the Children's wishes and improper under Section 2511(b). Mother's Brief at 15–16.

In its opinion, the trial court examined the testimony of the Mr. Antoine, the social worker, who testified that all of the Children are dependent upon and bonded with their caregivers. Specifically, the social worker testified that S.S.P. would not be harmed by the termination of Mother's parental rights because S.S.P. was very bonded with her current care giver, she does not speak about Mother and she specifically requested that she remain in her current placement. N.T. (Termination), 9/12/17, at 23. Mr. Antoine further testified that S.S.P. has a very good parent-child relationship with her current caregiver and that S.S.P.'s behavioral problems have decreased in her current placement. *Id*. at 21. Regarding K.-S.K.P., Mr. Antoine testified that K.-S.K.P. was doing well in his current placement, has resided there for the past year and one-half, and has a parent-child relationship with his caregiver. *Id*.

at 36. He further testified that K.-S.K.P. would not be harmed if Mother's parental rights were terminated because K.-S.K.P. has expressly stated that he does not want to live with Mother and has not mentioned her during Mr. Antoine's last four home visits. *Id*. at 37. Finally, as to S.K.P., Mr. Antoine testified that S.K.P. is very bonded to her caregiver, who has cared for her nearly since birth, and that after observing Mother and S.S.P. during visitation, Mother and S.K.P. have no bond. *Id*. at 41. Moreover, Mr. Antoine testified that he believed that termination of Mother's parental rights was in the best interest of the Children because Mother has failed to make even moderate progress with her case plan objectives of finding adequate housing, completing mental health and drug treatment over a two-year period, and that the Children should be offered permanency. *Id*. at 22, 41.

The trial court found that termination of Mother's parental rights is in the best interests of the Children "based on the testimony regarding the [C]hildren's safety, protection, mental, physical, and moral welfare." Trial Court Opinion, 1/23/18, at 9. Because competent evidence of record supports the trial court's decision to terminate Mother's parental rights, we will not disturb that decision.

Orders affirmed.

Judge Dubow did not participate in the consideration or decision of this Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/16/18