J-S25016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: O.L.M., III | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: O.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 214 WDA 2022 |

Appeal from the Order Entered January 19, 2022
In the Court of Common Pleas of Allegheny County Juvenile Division at
No(s):  CP-02-AP-0000189-2021

BEFORE:  BENDER, P.J.E., DUBOW, J., and KING, J.

MEMORANDUM BY DUBOW, J.:                **FILED:  September 14, 2022**

O.M. ("Father") appeals from the January 19, 2022 order entered in the Allegheny Court of Common Pleas that involuntarily terminated his parental rights to three-year-old O.L.M. ("Child").  Upon review, we affirm.

The factual and procedural history in this case is largely undisputed, as the parties submitted joint stipulations into evidence at the beginning of the termination hearing.  In sum, in June 2019, Child was born at West Penn Hospital while Mother was incarcerated.  Child tested positive for Subutex and remained in the newborn intensive care unit while he experienced withdrawal symptoms.  The Allegheny County Office of Children, Youth, and Families ("the Agency") contacted Father, who disclosed that he was currently homeless, had a lengthy criminal history including sexual assault of a minor when he was a minor, public drunkenness, and pending charges for aggravated assault. Father also disclosed a history of mental health issues including diagnoses of

depression, bi-polar disorder, and anxiety. The Agency obtained emergency custody of Child, and at the shelter care hearing, Father tested positive for drugs that were not prescribed to him. The Agency initially placed Child with Father's mother, who requested that Child be removed a few days later. The Agency then secured a foster home for Child, where Child has remained throughout the course of the dependency proceedings living with S.D ("Foster Mother").

On August 7, 2019, the trial court adjudicated Child dependent and the court ordered Father to continue to participate in mental health treatment, obtain a drug and alcohol assessment and follow recommendations, comply with drug screens, and obtain suitable housing. The court granted Father supervised visitation with Child two times per week.

In November of 2019, Father began living with Mother. At a permanency review hearing on December 14, 2019, Father tested positive for THC and Xanax. The trial court ordered Father to resolve his criminal charges, attend dual diagnosis treatment, submit to random drug screens, attend parenting classes, and confirm his visits with Child 24 hours in advance. On June 23, 2020, the court held another permanency review hearing. In addition to the above-mentioned goals, the court ordered Father to cooperate with in-home services and allowed Father's visits with Child to be moved to a community setting. On August 26, 2020, after a hearing, the trial court found that Father was compliant with dual diagnosis treatment, although heard testimony that Foster Mother was concerned that Father was under the

influence of drugs or alcohol during a visit with Child due to Father's unresponsive nature. The court ordered Father to have an updated drug and alcohol evaluation.

On October 12, 2020, Mother died from a drug overdose. Father, who had been living with Mother for over a year, was not named in the lease agreement and was unable to remain in the apartment after Mother's death. Father moved into a homeless shelter and then stayed with friends until he was admitted to a hospital psychiatric unit on November 17 and 18, 2020, and again on November 28 through December 2, 2020. After his release, Father continued to experience housing instability, again staying in a homeless shelter and with various friends. At a December 8, 2020, hearing, the trial court ordered Father to comply with mental health treatment.

On April 14, 2021, after a hearing, the court once again ordered Father to comply with an appropriate level of mental health treatment. After the August 31, 2021, permanency review hearing, the trial court heard evidence that Father was incarcerated on three different occasions since the last court hearing and had criminal charges pending. The court ordered Father's supervised visits with Child to be decreased to once a week.

On September 17, 2021, the Agency field a termination of parental rights petition against Father seeking to terminate his parental rights under Sections 2511(a)(2), (5), (8), and (b) of the Adoption Act. The trial court appointed Child's guardian *ad litem* (GAL) to serve as Child's legal counsel after the court found that the dual role did not pose a conflict.

- 3 -

On January 14, 2022, the trial court held a hearing on the termination petition. It heard testimony from Courtney Reinhardt, Agency supervisor; Greensburg police officer Chase Mollomo; Kristina Scott, Children's Institute foster care specialist; Patricia Pepe, Ph.D, licensed psychologist and expert in the field of child psychology; Brian Reese, Axiom family counseling drug and alcohol clinical supervisor; and Father.

Ms. Reinhardt testified in accordance with the above-stated facts. Additionally, Ms. Reinhardt testified that Father was non-compliant with the recommended level of both drug and alcohol and mental health treatment. Ms. Reinhardt testified that Father never participated in the recommended intensive outpatient treatment, despite the Agency offering in-home services and a Father Engagement Specialist to assist Father with obtaining appropriate services. Ms. Reinhardt also informed the court that after Father's inpatient psychiatric hospitalizations, he never increased his level of treatment as was typically recommended.

Ms. Reinhardt testified that Father continued to display impulsivity and poor decision making as evidenced by his continued criminal activity, including the five sets of criminal charges filed against Father—in June 2020 and in March, May, June, and August of 2021—while Child has been in foster care. Ms. Reinhardt also expressed concern that Father has been incarcerated on outstanding warrants four times since Child's birth and was serving probation and had pending charges at the time of the termination hearing. Ms. Reinhardt stated that Father has not demonstrated housing stability and has

moved 13 times since Child has been in care. Ms. Reinhardt explained that Father provided the Agency with a lease a few weeks ago, but the document was difficult to read and decipher. She further testified that Father completed the Family Resources Nurturing Program, but was discharged from the Justice Works Coached Visitation program for noncompliance and failed to attend any of Child's medical, educational, or treatment appointments.

Ms. Reinhardt testified that she believed that termination of Father's parental rights would be in Child's best interest. Ms. Reinhardt stated that the Agency has safety concerns if Father were to be Child's primary caretaker due to Father's ongoing impulsivity and aggression, as well as the fact that Father has not progressed to unsupervised visitation with Child.

Officer Mollomo testified that he arrested Father on July 14, 2021, and charged him with Simple Assault and Terroristic Threats after Father allegedly became irate, chased a woman through an apartment complex while threatening her, and then hid from police in a closed bathroom. Upon arrest, Officer Mollomo discovered that Appellant had an outstanding warrant from another jurisdiction.

Ms. Scott testified that she supervises visits between Father and Child. Ms. Scott explained that Father has been offered a total of 279 visits while Child has been in the care of the Agency; Father has attended 196 visits, Father has canceled 68 visits, and 15 visits were canceled by the Agency or Child for various reasons. Ms. Scott testified that Father missed 24 visits from May 5, 2021 to August 16, 2021 due to 2 holidays, his incarceration, his no-

shows, or no available ride. Ms. Scott stated that from August to October 2021 visits were difficult and Child would often have "melt downs" or "[t]antrums, screaming, yelling, kicking, throwing toys" or even swearing at Father in response to interactions with Father. N.T. Hearing, 1/14/22, at 37-38. Ms. Scott further stated that visits improved substantially from October 2021 to January 2022 after Foster Mother reminded Father that Child has sensory processing issues and gave Father tips on how to be affectionate with Child and how to redirect Child. Ms. Scott testified that Child is usually excited to see Father, and during the visits Father and Child play and Father feeds Child snacks and changes his diaper when appropriate. However, Ms. Scott explained that whenever Child has a meltdown, it is usually because Father does not read Child's cues and tries to hug Child and pick him up.

Dr. Pepe completed interactional evaluations between Father and Child and between Foster Mother and Child. Dr. Pepe also attempted to complete an individual evaluation of Father, who was uncooperative with parts of the evaluation. Dr. Pepe testified that she diagnosed Father with anti-social personality disorder, uncomplicated bereavement, history of depression, history of anxiety, and history of bipolar disorder. Dr. Pepe testified that there are "grave implications related to child care for parents that are diagnosed with anti-social personality disorder[,]" a disorder which entails a "pattern of disregard for and the violation of others[.]" *Id.* at 66. Dr. Pepe based this diagnosis on Father's "extensive criminal history, his attitude and that there is the potential to become aggressive and irritable easily, repeated physical

attacks or assaults." *Id.* at 66-67. Dr. Pepe explained her clinical concerns for a parent diagnosed with anti-social personality disorder, including: "the parents can become irritable, can have poor frustration tolerance and there can be a general lack of stability, for example, if a parent is incarcerated or arrested then it leaves the child without that parent." *Id.* at 68. Dr. Pepe also explained that Father was evasive and tried to intimidate her during the evaluation. Dr. Pepe testified that, considering Father's mental health diagnoses, Father's mental health treatment less than twice a month at Axiom from November 2018 to June 2021 was not sufficient. Dr. Pepe recommended more intense treatment to occur at a minimum of once a week.

Dr. Pepe testified that Child's primary attachment is with Foster Mother, who Child considers his psychological parent, or the person who is responsible for taking care of him, keeping him safe, and meeting his needs daily. Dr. Pepe noted that Child displays spontaneous physical affection for Foster Mother, calls her "mommy," and cries for Foster Mother when she is out of the room.

Dr. Pepe testified that Child does not display an attachment or bond to Father and merely tolerates his presence. Dr. Pepe explained that during a visit, she observed Child set up two playhouses as a barrier between Child and Father, which Dr. Pepe characterized as a "coping mechanism for his own sense of safety and security to feel as though, you know, he had a barrier, a separation." *Id.* at 59. Dr. Pepe explained that Child's lack of attachment to Father is likely due to inconsistent nature of their relationship.

Finally, Dr. Pepe testified that Father does not have the capacity to meet Child's essential needs at this time and recommended that Child be provided with permanency through adoption. Dr. Pepe testified that there would be no emotional detriment to Child if Father's rights were terminated. In contrast, Dr. Pepe testified that if Child were to be removed from Foster Mother's care, it could result in psychological trauma, depression, or developmental regression in Child.

Mr. Reese testified that Father has been compliant with therapy on a weekly or biweekly basis since August 5, 2021, his second admission to the program, with no sign of relapse. Mr. Reese explained that Father is receiving treatment for alcohol dependency, cannabis abuse, and the following disorders: general anxiety, major depressive, post-traumatic stress, and bipolar disorder. He further testified that he also provides mental health treatment to Father, and that Father is compliant. Mr. Reese confirmed that Father submits to random drug screens and meets with a nurse practitioner for medication management. Mr. Reese explained that Father was previously receiving monthly treatment from November 2018 to June 2021, and he was subsequently discharged due to his incarceration in July.

Father testified that he has voluntarily been in treatment at Axiom since 2018, and he reengaged in treatment within two weeks of being released from his last incarceration in July 2021. Father explained that on December 1, 2021, he signed a year-long lease on an apartment, but that the Agency has not been out to see it. Father admitted that he was using marijuana illegally

when Child was first born, but explained that he has since gotten a medical marijuana card. Father denied abusing alcohol.

Father testified that he felt like he and Mother were very close to reunifying with Child right before Mother's death. Father explained that he had appropriate housing and was complying with his goals. Father testified that he felt betrayed when Mother died and stated that he was "[j]ust keeping myself together." *Id.* at 126. Father testified that he pleaded guilty to Resisting Arrest and Public Drunkenness on July 27, 2021, Resisting Arrest and Simple Assault on September 2, 2021, and Unauthorized Use of a Motor Vehicle and Accident Involving Damage to an Attended Vehicle on November 10, 2021. Father confirmed that he started to get his "stuff back together" in July of 2021 after he was released from incarceration. *Id.* Father explained that he has not been arrested since then and is currently on probation.

Father testified that his visits with Child are "great." *Id.* at 122. Father stated that he believes he is "capable of being a great father" to his son. *Id.* at 128. Father stated that his progress was delayed when Mother died and that was not his fault. Father testified, "I just feel like I can't move on in life, I can't move on in life I feel like until I just have my son. . . So I just like, you know, praying to God and just trying to do every single thing I can do in my power to get my son back to me because he needs his dad." *Id.* Father confirmed that he would like more time to meet his goals and reunify with his son and that he does not want his parental rights to be terminated.

At the conclusion of the hearing, the trial court terminated parental rights. Child's attorney, acting in a court-approved dual role of GAL and legal counsel, advocated for and agreed with the court's decision to terminate Father's parental rights.

Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issue for our review: "Did the evidence support the conclusion of the trial court that the causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent?" Father's Br. at 4 (some capitalization omitted).

When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all

credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." ***In re Adoption of A.C.***, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." ***Id.*** (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." ***Id.*** (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. ***In re K.Z.S.***, 946 A.2d 753, 758 (Pa. Super. 2008).

In his sole issue, Father avers that the trial court abused its discretion when it terminated his parental rights pursuant to Section 2511(a)(2). Father's Br. at 6. Father avers that the factors creating his incapacity to parent were pending criminal charges, housing instability, and his need for dual treatment for mental health and drug and alcohol issues. ***Id.*** Father argues that he remedied those factors by September 2020, but experienced a setback when Mother passed away and he once again "fell victim to each of

- 11 -

his incapacities." *Id.* at 7. However, Father further argues, that at the time of the hearing, he had remedied his incapacities except for pending criminal charges. Accordingly, Father contends that the trial court abused its discretion when it terminated his parental rights. We disagree.

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). Thus, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super 2010). This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation and emphasis omitted).

It is well-settled that a parent is "required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *Id.* at 1117-18 (citation omitted). Notably, a "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.* (citation omitted). Finally, a parent's repeated pattern of criminal activity coupled with a failure to comply with court-ordered goals may satisfy the requisites of incapacity, abuse, neglect or refusal. *In re Adoption of W.J.R.*, 952 A.2d 680, 687 (Pa. Super. 2008).

Applying these principles, the trial court concluded that the Agency presented clear and convincing evidence that Father does not have the capacity to perform parental duties, despite his best efforts. The trial court found that "Father's multiple periods of incarceration and psychiatric hospitalizations have prevented him from establishing and maintaining himself as a consistent presence in Child's life." Trial Ct. Op., dated 4/19/22, at 13. The trial court emphasized that in the year leading up to the termination hearing, Father experienced 4 arrests, 3 incarcerations, and a psychiatric hospitalization. The trial court opined that Father "failed to engage in the level of treatment necessary to sufficiently address his drug and alcohol and mental health issues" despite the court ordering Father to engage in an appropriate, *i.e.* higher, level of treatment. *Id.* at 15. The trial court also found that despite Father participating in parenting classes, Father "never demonstrated sufficient parenting ability to progress to unsupervised visitation." *Id.* at 16.

Finally, the trial court credited Dr. Pepe's expert opinion that "Father lacks the capacity to meet Child's essential needs," Child's primary attachment is with Foster Mother, and Child "merely tolerates" Father rather than looking to Father to fulfill his needs. *Id.* (quotation marks omitted).

As stated above, the trial court is free to believe all, part, or none of the evidence as well as make credibility determinations and weigh the evidence. The evidence of Father's repeated criminal activity, failure to engage in an appropriate level of mental health and drug and alcohol treatment, failure to progress to supervised visitation, and inconsistent visitation coupled with Dr. Pepe's expert testimony provided the trial court with ample evidence to support a termination of Father's parental rights pursuant to Section 2511(a)(2). We decline to reweigh the evidence. As the record supports the trial court's findings, we discern no abuse of discretion.[1]

Order affirmed.

---

[1] We decline to address whether the Agency has presented sufficient evidence to satisfy the requirements for termination pursuant to Section 2511(b) because Father has not raised this challenge on appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/14/2022