J-S14002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3112 EDA 2018 |

Appeal from the Order Entered September 19, 2018
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s):  36 O.C.A. 2018,
42-DP-2017, FID: 45-FN-25-2015

\*\*\*\*\*

| | | |
|---|---|---|
| IN THE INTEREST OF: N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3113 EDA 2018 |

Appeal from the Order Entered September 19, 2018
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s):  34 O.C.A. 2018,
40 DP 2015, 45-FN-25-2015

\*\*\*\*\*

| | | |
|---|---|---|
| IN THE INTEREST OF: B.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3114 EDA 2018 |

J-S14002-19

Appeal from the Order Entered September 19, 2018
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s): 37 O.C.A. 2018,
39 DP 2015, 45-FN-25-2015

BEFORE:   LAZARUS, J., NICHOLS, J., and PELLEGRINI*, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 23, 2019**

C.B. (Father) appeals[1] from the trial court's orders involuntarily

terminating his parental rights to his three minor children, B.B. (born 3/2011),

_____

[1] In **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), our Supreme
Court recently held:

> [I]n future cases [Pa.R.A.P.] 341(a) will, in accordance with it
> Official Note, require that when a **single order resolves issues
> arising on more than one lower court docket**, separate
> notices of appeal must be filed.  The failure to do so will result in
> quashal of the appeal.

**Id.** at 977 (emphasis added).  Here, Father filed one notice of appeal for each
Child.  Each notice of appeal contains two docket numbers, one from the
dependency (goal change) matter and the other from the adoption
(termination) matter in each Child's case.  However, the order from which
Father appeals, entered on September 19, 2018, only lists the adoption docket
number for each Child (36 O.C.A. 2018;  34 O.C.A. 2018; and 37 O.C.A. 2018)
and resolves only the issue regarding the termination of Father's parental
rights to Children.  As part of the termination process, the order also permits
the adoption of Child to proceed without Father's consent and transfers
custody of Children to CYS.  **Id.** at 2.  The order does not resolve any issues
with regard to dependency.  Therefore, because the orders do not resolve
issues arising from anything but the lower court's adoption dockets, i.e.,
issues relating to terminating parental rights, we need not quash the appeal
under **Walker**.

* Retired Senior Judge assigned to the Superior Court.

- 2 -

N.B. (born 3/2014), and M.B. (born 2/2016) (collectively, "Children"). After careful review, we affirm.

Monroe County Children and Youth Services (CYS) first became involved with Father's family in April 2015 when the agency became aware that Father was selling cocaine and heroin out of the family home. On May 1, 2015, B.B. and N.B.[2] were adjudicated dependent and placed into foster care. In early 2016, dependency was terminated and B.B. and N.B. returned to live at home with Mother and Father;[3] Father, however, was incarcerated months later on firearms and drug charges. In April 2017, CYS received a referral that Children's youngest sibling, six-week old "Baby M.B.2,"[4] had been hospitalized with two skull fractures, a brain bleed, a fractured cheekbone, and a broken nose. The court entered an emergency protective custody order for Children and they were placed into agency custody and put back into foster care. At that time, Paternal Grandmother (Grandmother) requested to be a placement resource for Children, however she reported having some health concerns, told the agency that she does not drive, and stated that she would call the caseworkers later to determine if she wanted to be a resource. Mother was arrested on April 30, 2017, and charged with attempted homicide, aggravated

_____

[2] M.B. had not yet been born.

[3] Mother is not involved in the current appeal.

[4] Baby M.B.2 is not involved in the current appeal.

assault, and endangering the welfare of a child.[5]   Grandmother contacted the agency on May 1, 2017, again indicating that she wished to be a placement resource.

In September 2017, the court suspended Mother's and Father's visitation with Children and changed the goal to adoption, with a concurrent goal of placement with a legal custodian (relative).  Foster mother's daughter and son-in-law[6] have been approved as adoptive resources for Children.  On April 23, 2018, Grandmother indicated that she did not want to be a resource for Baby M.B.2 due to his significant medical issues; however, Grandmother stated that she still wanted to be an adoptive resource for Children, who are the subject of the current termination matter.

On June 4, 2018, CYS filed a petition to involuntarily terminate Father's parental rights to Children.  On September 18, 2018, the court held a termination hearing.  Mother, Father, Grandmother, Paternal Aunt, CYS Caseworker Melissa Daubert, attorney Brandie Belanger, and guardian *ad*

---

[5] Mother was sentenced to 4-8 years' incarceration, with a two-year probationary tail.  Additionally, in September 2017, the court entered an order finding aggravating circumstances existed with regard to Mother as the perpetrator of abuse toward M.B.2.

[6] Foster mother's daughter and son-in-law regularly visit with Children at the foster home, are very involved with Children, and vacation with Children and foster parents.

*litem* Barbara Fitzgerald[7] testified at the proceeding. At the time of the termination hearing, Children had been living with foster parents for 17 months.[8] Caseworker Daubert testified that Mother and Father, who were incarcerated at the time of the termination hearing, are not ready, willing or able to take care of Children, that Children are in need of permanency, and that it is in Children's best interest to have Father's parental rights terminated. N.T. Termination Hearing, 9/18/18, at 45-46. Caseworker Daubert testified that the only service plan objective that Father had completed was a "Read to Your Child" program in prison. *Id.* at 87. Daubert also testified that B.B. told her that Father used to hit Mother and that he remembers his parents fighting.

At the time of the termination hearing, an Interstate Custody Placement Compact (ICPC)[9] from New Jersey, Grandmother's home state, was still

---

[7] Each child was represented by guardian *ad litem*, Barbara Fitzgerald, and attorney, Brandie Belanger, Esquire, at the termination hearing. **See** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 2018 PA Super 334 (Pa. Super. filed Dec. 10, 2018) (en banc), **but see In Re: T.S., E.S.**, 2018 Pa. LEXIS 4374, 2018 WL 4001825, at *10 (Pa. filed Aug. 22, 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

[8] Baby M.B.2 has been placed with a separate foster family since his release from the hospital. The family is a pre-adoptive placement for him.

[9] **See** 62 P.S. § 761. The ICPC is an agreement among the states, the District of Columbia and the Virgin Islands to cooperate with each other in the interstate placement of children. **See id.** at Article I ("(a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable

pending. *Id.* at 63. However, in January 2018, an initial, preliminary evaluation and recommendation indicated that Grandmother would be a good resource for Children. *Id.* at 76. Caseworker Daubert noted that that recommendation did not include a home visit with Grandmother, an assessment as to whether there was a bond between Grandmother and Children, or a determination as to whether placement with Grandmother was appropriate based upon concerns about Grandmother's health history. Grandmother testified that in January 2018 she was hospitalized for heart failure due to a medication issue, *id.* at 97, and that in July 2018, Paternal Aunt moved in with her to help her cook and clean. *Id.* at 108. Children's guardian *ad litem* testified that Grandmother had never called CYS to set up a visit with Children or to check in on the Children, and had only attended one placement hearing. *Id.* at 85.

Grandmother, on the other hand, testified that she called foster mother to speak to Children and that foster mother would not answer her phone. *Id.* at 100. Grandmother also testified that she called CYS four or five times and was able to speak to Children on two of those occasions. *Id.* Grandmother testified that she has been preparing for Children to live with her for over a

environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.").

year and had attended foster parent classes.[10] *Id.* at 103-104. At the time of the hearing, Grandmother was not aware of Baby M.B.2's medical condition and the extent of his medical needs, *id.* at 101; when Grandmother heard testimony about the baby's extensive medical condition, she told the court that she would not be able to care for him. *Id.* at 102. Grandmother also testified that Children lived with her when Mother was pregnant with M.B. until two months after M.B. was born, in April 2016. *Id.* at 111.

Father, who was still incarcerated at the time of the termination hearing, testified that his minimum date of release from incarceration is August 2021,[11] although he had an appeal pending. *Id.* at 129. He testified that while he currently is unable to care for Children, he would like Children to be with his mother and sister (Grandmother and Paternal Aunt) while he is incarcerated. *Id.* at 120. Father testified that he loves his Children, wants to see them, and wants his visitation rights reinstated. *Id.* at 135. At the time of the hearing, Father had not seen Children in over a year. *Id.* Father also testified that he called foster mother weekly to talk to Children but that she either did not have

---

[10] Paternal Aunt also was a foster parent with custody of two of her other nieces and nephews in 2005-2006. N.T. Termination Hearing, 9/18/18, at 118.

[11] In August, a caseworker met with Father in jail. Father was on the waiting list for drug and alcohol and parenting classes. Father also reported that he did not believe Mother inflicted the injuries on Baby M.B.2. Rather, he told CYS caseworkers that he believed either M.B. or B.B. inflicted the injuries on their baby brother. Father was not permitted to visit with Children at the prison at that time due to prison unit restrictions.

her phone in her possession or she told him that the Children were in bed. *Id.* at 142.

Children's attorney testified that she met with B.B. and N.B., who indicated that they did not want to live with Father. *Id.* at 144. Both children recall Father being abusive when the family lived together. The oldest of the Children, B.B., who was seven-and-one-half years old at the time of the meeting, did not remember Grandmother. Attorney Belanger concluded that there was no bond between Grandmother and Children. *Id.* at 145-46.

Following the hearing, the court entered an order involuntarily terminating Father's parental rights to Children pursuant to sections 2511(a)(1), (2), (8), and (b) of the Adoption Act.[12] Father filed a timely notice of appeal and concurrent Pa.R.A.P. 1925(a)(2)(i) concise statement of errors complained of on appeal. He raises one issue for our consideration:

> Whether the [l]ower [c]ourt erred by terminating Father's [p]arental [r]ights . . . where Monroe County Children and Youth Services failed to make reasonable efforts towards reunification with [P]aternal [G]randmother despite Father's clear and settled purpose to have his mother/family care for his children, and despite a lack of clear convincing evidence that termination best served the children's needs and welfare?

Appellant's Brief, at 14.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined

---

[12] 23 Pa.C.S. §§ 2101-2910.

as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)). Moreover, the fact that a parent is incarcerated neither compels nor precludes termination. Rather, it is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under section 2511(a)(2), where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied. *See In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012).

After a comprehensive review of the certified record, the parties' briefs on appeal, and relevant case law, we have concluded that the trial court adequately disposes of Father's issue on appeal. We, therefore, rely upon the well-written opinion, authored by the Honorable Jonathan Mark, to affirm the order involuntarily terminating Father's parental rights to Children pursuant

to 23 Pa.C.S. §§ 2511(a)(2) and (b). *See* Trial Court Opinion, 12/4/18, at 22-28 (termination proper where court found: Father has been incarcerated since Children were adjudicated dependent and placed in CYS' care in April 2017; Father not eligible for parole until at least August 2021; Father had not seen Children in over one year at the time of termination hearing; Father has not used available resources and taken affirmative steps to support parent-child relationship while incarcerated; Father has failed to perform parental duties for almost two years and lacked capacity to parent Children prior to incarceration; Father has only made handful of calls to talk to Children and has written single card to each Child; Father has never promoted Children's mental, physical, spiritual or emotional well-being; Father was selling drugs out of family home during brief time he lived with B.B. and N.B.; Children do not want to live with Father; little to no bond exists between Father and Children; any apparent bond between Father and oldest Child, B.B., is not healthy; Children are bonded with foster family; foster mother's daughter and son-in-law are adoptive resource for Children; termination of Father's parental rights would be in Children's best interests; CYS need not make reasonable efforts to reunify Children with grandparent under 23 Pa.C.S. §§ 2511(a)(2) and (8); Grandmother had not yet been approved as kinship resource at time of hearing; and no evidence of bond between Grandmother and Children).

Thus, we conclude, based on competent evidence in the record, the trial court's decision to involuntarily terminate Father's parental rights was neither an abuse of discretion nor an error of law. *In re A.R.*, *supra*. We direct the

parties to attach a copy of Judge Mark's opinion in the event of further proceedings in the matter.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/23/19

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
JUVENILE COURT DIVISION

| | |
|---|---|
| IN THE INTEREST OF | : |
| | : |
| M.B., a minor | :    34 OCA 2018 |
| | :    42 DP 2017 |
| | :    Appeal No. 3112 EDA 2018 |

| | |
|---|---|
| IN THE INTEREST OF | : |
| | : |
| N.B., a minor | :    36 OCA 2018 |
| | :    40 DP 2015 |
| | :    Appeal No. 3113 EDA 2018 |

| | |
|---|---|
| IN THE INTEREST OF | : |
| | : |
| B.B., a minor | :    37 OCA 2018 |
| | :    39 DP 2015 |
| | :    Appeal No. 3114 EDA 2018 |

## OPINION PURSUANT TO Pa. R.A.P. 1925(a)

C.B. ("Father") has appealed our September 19, 2018 decrees that terminated his parental rights to his children, B.B., age seven, N.B., age four, and M.B., age two (collectively the "Children").[1] Father has complied with the Children's Fast Track rules by filing a Rule 1925(b) statement with his notices of appeal. We now issue this opinion pursuant to Pa.R.A.P. 1925(a).

## Background

The challenged decrees were issued after a consolidated hearing convened on September 18, 2018 on the petitions of Monroe County Children and Youth Services ("CYS" or the "Agency") for termination of Father's parental rights ("TPR") as to all three of the Children. From the evidence presented at hearing and the records and

---

[1] The parental rights of Children's mother were also terminated. Mother did not appeal the termination decrees.

1

files of this Court in the dependency and other proceedings involving family members, the facts may be summarized as follows:

The family first came to the attention of Monroe County Children and Youth Services ("CYS" or the "Agency") in April 2015 when Father was caught selling heroin and cocaine out of their home. The ensuing investigation revealed that the Children's mother ("Mother") was aware of Father's activities. As a result:

On April 23, 2015, emergency protective custody of B.B. and N.B., the two Children who had been born as of that time, was taken. On May 1, 2015, B.B. and N.B. were adjudicated dependent. Both were placed in foster care. Neither parent appealed the dependency adjudications.

B.B. and N.B. remained dependent and in care until June 30, 2016, at which time dependency was terminated and legal and physical custody of both of the Children was returned to Father and Mother. In February of 2016, during the time that B.B. and N.B. were dependent, M.B. was born.

Also as a direct result of Father's drug trafficking activities, Father, who has a an extensive prior criminal record including a conviction for aggravated assault and prior drug crimes, was arrested and charged in two separate cases with drug trafficking and firearms offenses. Father was incarcerated when B.B. and N.B. were adjudicated dependent. He was released on bail on July 1, 2015. In October of 2015, Father pled guilty in both cases. However, his sentencing hearing was continued several times. As a result, Father was free on bail when M.B. was born and at the time B.B. and N.B.'s dependencies were terminated.

On October 11, 2016, Father was sentenced to 5 to 10 years' incarceration in a

2

state correctional facility. Father was deemed ineligible for the RRRI program due to his prior aggravated assault conviction. He is not eligible for parole until, at the earliest, August of 2021.

On March 3, 2017, Father's youngest child, M.B.2., was born.[2] Due to Father's incarceration, M.B. 2 has never been in Father's care.

The family returned to the attention of CYS in April of 2017 when M.B.2 was hospitalized with serious injuries, including two skull fractures and a brain bleed, from which he continues to suffer today and will likely have to live with throughout the remainder of his life. At first, Mother blamed B.B., the oldest child, for causing the injuries. However, investigation revealed that it was actually Mother who harmed M.B.2.

As a result, Mother was arrested and charged with Attempted Homicide, Aggravated Assault, and related charges against M.B.2. Mother has been incarcerated ever since. Mother ultimately pled *nolo contendere* to Aggravated Assault and was sentenced to 4 to 8 years' incarceration, followed by two years of probation.[3]

Also as a result of the injuries Mother caused M.B.2 to suffer, and because additional referrals and investigation revealed that Mother had acted inappropriately as to all of her children, emergency protective custody of the Children and M.B.2 was taken. The Children have been continuously in care ever since.

After a shelter care hearing, emergency protective custody was continued. On

---

[2] Since there are two Children with the initials "M.B.," we will use the designation "M.B.2" to identify and refer to the youngest child. In the instant proceedings, CYS also sought termination of the parental rights of both Father and Mother as to M.B.2. Neither parent contested termination as to M.B.2. Similarly, neither parent appealed the decree that terminated their parental rights to M.B.2.

[3] Her plea and sentence are no doubt the reasons why Mother did not contest the terminations and did not appeal the termination decrees.

3

May 15, 2017, the Children and M.B.2 were adjudicated dependent — the second dependency adjudication for B.B. and N.B. Father did not challenge or appeal the dependency adjudications. The Children and M.B.2 have been dependent since that time.

Since the adjudications, regular permanency and placement review hearings have been held in the Children's dependency proceedings. After each hearing, the dependencies have been continued.

In addition, early in the fall of 2017, CYS sought a finding of Aggravated Circumstances against Mother as well as suspension of visitation for both parents. On September 27, 2017, Aggravated Circumstances were found as to Mother and the Agency was relieved of the obligation to provide reunification services as to her. After additional hearings, we issued an order suspending visitation as to both parents. Further, the goal of the Children's dependency cases was changed to Adoption. Father did not appeal the suspension of visitation or the goal change.

In April of 2018, CYS sent Father a letter notifying him that the Agency would be filing for termination of parental rights. Father did not specifically respond.

On July 27, 2018, CYS filed the instant TPR petitions. The Agency also filed petitions in the underlying dependency proceedings asking this Court to conduct simultaneous permanency review hearings.

At that point, the Children had been in the care of persons other than their parents for 15 months. Further, Father had been incarcerated for 21 months.

In this regard, this case is marked by Father's criminal behaviors and resulting incarceration. Father was incarcerated for two months in 2015 while B.B. and N.B.

4

were dependent. M.B. was born after pled guilty and was awaiting imposition of his current sentence. M.B.2 was born while Father was in prison. The Children are currently in care in part because Father had been incarcerated on a long state sentence at the time Mother injured M.B.2, as a result of which no parent was available to care for them. In all, Father was incarcerated for two months during B.B. and N.B.'s initial dependency proceedings and for a total of 23 months leading up to the termination hearing. He is not eligible for parole until, at the earliest, August of 2021, and does not max out on his sentence until August of 2026.

Father is serving his sentence at SCI Camp Hill. CYS has had contact with him there. Father indicated that he was on the waiting list to take drug and alcohol as well as parenting classes. He requested visits; however, due to the restrictions of the housing unit that he was placed in, as a result of his history and his behaviors, Father was initially unable to receive visits. As indicated, visits were later suspended, a determination that Father did not contest.

Father acknowledged that he hasn't seen the Children in over a year. While the suspension of visitation provides an explanation for the lack of physical visitation during most of that time, it does not explain why Father has had minimal contact with the Children by phone calls, letters, cards, or other means or why he has not otherwise used available means to remain in communication with them.

At hearing, Father testified about his post release plans. He has no specific home plan other than to come back to this area when he is able and permitted to do so and to cash-in on a purported promise from a former employer. Father has no support system here, save for a nineteen year old daughter.

5

From his testimony, the position advanced by his attorney, and his assignments of error, it appears that Father feels the Children should be placed with his mother ("Paternal Grandmother"), as a sort of place holder for them, until he is released. However, the record demonstrates that Paternal Grandmother, who lives in New Jersey, is not currently a suitable or available resource.

Soon after the Children came into care, Paternal Grandmother, with whom the family had previously lived, expressed her willingness to be a resource for the Children. However, citing health and transportation issues, she then equivocated. Several weeks later, she re-stated her desire to be a resource for all of the Children. Accordingly, CYS initiated an Interstate Compact on the Placement of Children ("ICPC") request with New Jersey. At the termination hearing, Paternal Grandmother testified that she would like to be a resource for all of the Children except for M.B.2, whose medical needs she did not believe she could handle.

However, the ICPC process has not been completed. Thus, Paternal Grandmother cannot at this time be a resource. In this regard, although New Jersey has not yet made a formal determination, CYS has concerns about Paternal Grandmother's health and medical issues and their impact on her ability to care for the Children.

Further, CYS has attempted to arrange visits between Paternal Grandmother and the Children. However, the attempts were unsuccessful and Paternal Grandmother has not seen the Children since they came into care.

Along similar lines, Paternal Grandmother has only spoken to the Children by phone twice since they came into care.

6

Finally, there was little evidence of a bond between the Children and Paternal Grandmother.

On the other hand, there was evidence that the Children are bonded with their foster family. In this regard, the Children had been in the same foster home the entire time they had been in care. The Children are bonded with their foster mother and, significantly, have also bonded with their foster mother's biological daughter and her husband. This familial relationship between the Children and their foster mother's daughter formed through the daughters' extensive involvement in the Children's lives, which includes visiting regularly, assisting in the everyday care of the Children, participating with the Children in family functions, and taking vacations together. As a result of this relationship, the foster mother's daughter and her husband desire to adopt the Children. Necessary approvals for the adoption have been obtained.

## Discussion

The law that we applied in terminating Father's parental rights is well settled. In comprehensive summary:

In termination cases, the burden is upon the petitioner, in this case CYS, to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008). Clear and convincing evidence has been defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re K.Z.S.*, 946 A.2d 753, 757 (Pa. Super. 2008) (citation omitted). It is well established that a court must

7

examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination. *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

Termination of parental rights is controlled by Section 2511 of the Adoption Act, 23 Pa. C.S.A. Section 2511. In this case, CYS sought termination of Mother and Father's parental rights on the following grounds:

Section 2511. Grounds for Involuntary Termination

(a)     General Rule. – The rights of a parent in regard to a child may be terminated after a petition filed any of the following grounds:

(1)     The parents have, for a period of more than six (6) months prior to the filing of this petition, failed to perform their parental duties;

(2)     The repeated and continued incapacity, abuse, neglect or refusal of the parents has caused the child to be without essential parental care, control or subsistence necessary for his physical and mental well-being and the conditions and causes of the inability, abuse, neglect or refusal have not been remedied by the parents;

\* \* \*

(8)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

(b)     Other considerations – The court in terminating the rights of a parent shall give primary consideration of the

8

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. C.S.A. Section 2511(a)(1), (2), (8), and (b). Satisfaction of any subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for involuntary termination of parental rights. *In re K.Z.S., supra; In re R.J.S.*, 901 A.2d 502 (Pa. Super. 2006). Accordingly, an appellate court "need only agree with the orphan's court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *app. den.*, 863 A.2d 1141 (Pa. 2004). *See also In re Adoption of C.J.P.*, 114 A.3d 1046 (Pa. Super. 2015); *In re K.H.B.*, 107 A.3d 175 (Pa. Super. 2014).

Section 2511 requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

9

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). *See also In re Adoption of C.J.P., supra; In re T.D., supra; In re Adoption of R.J.S., supra.*

In analyzing the conduct of a parent, the applicable statutory language must be considered. As the third sentence of Section 2511(b) directs, when subsections (a)(1) or (8) of Section 2511(a) are cited as the grounds for termination, we may not consider actions of a parent to remedy the conditions that necessitated the dependent child's placement which are initiated after the parent receives notice of the filing of the termination petition. *In re Adoption of C.J.P., supra; In re K.Z.S., supra; In re D.W.,* 856 A.2d 1231 (Pa. Super. 2004).

Under Section 2511(a)(1), parental rights may be terminated if, for a period of at least six months, a parent *either* demonstrates a settled purpose of relinquishing parental claims to a child *or* fails to perform parental duties. *In re Adoption of R.J.S., supra; In re Adoption of J.M.M.*, 782 A.2d 1024 (Pa. Super. 2001). As the Superior Court has explained:

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.

*In re K.Z.S., supra* at 758 (Pa. Super. 2008) (case citations and quotation marks omitted). *See also In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct.

10

Rather, those grounds may include acts of refusal as well as incapacity to perform parental duties.

> Parental rights may be terminated pursuant to Section 2511(a)(2) if three conditions are met: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental wellbeing. 23 Pa.C.S.A. § 2511(a)(2). Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.... Further, grounds for termination under subsection (a)(2) are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental duties.

In re E.A.P., 944 A.2d 79, 82 (Pa. Super. 2008) (case citations and internal quotation marks omitted) (emphasis in original). See In re Adoption of R.J.S., supra. Thus,

> While sincere efforts to perform parental duties can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness

11

regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

*In re Z.P.*, 994 A.2d at 1117-18 (case citations and internal quotation marks omitted). Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child. *In re Adoption of Michael J.C.*, 486 A.2d 371, 375 (Pa. 1984); *In re Z.P, supra.*

To terminate parental rights under Section 2511 (a)(8), the party seeking termination of parental rights need only show "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or the placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of R.J.S.*, *supra* at 511. *See In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). The one year time period is significant. As the Superior Court has explained:

> Section 2511(a)(8) sets a twelve—month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic period. The relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing. This Court has acknowledged:

> > [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute

12

implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re I.E.P.*, 87 A.2d 340, 345-46 (Pa. Super. 2014) (case citations and internal quotation marks omitted).

With respect to the "needs and welfare" analysis pertinent to subsections 2511(a)(8), and (b), the Superior Court has observed:

[I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the 'needs and welfare of the child' prior to proceeding to Section 2511(b), which focuses on the 'developmental, physical and emotional needs and welfare of the child.' Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the 'needs and welfare' of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008–1009 (Pa. Super. 2008) (*en banc*) (citations omitted). *See also In re I.E.P.*, *supra*; *In re Adoption of K.J.*, *supra* at 1133. Subsection 2511(a)(8), "does not require an evaluation of the remedial efforts of either

13

the parent or DHS." *In re B.C.*, 36 A.3d 601, 611 (Pa. Super. 2012) (citing *C.L.G.*, 956 A.2d at 1007).

Simply put, Section 2511, including the subsections cited and explained above, outlines certain irreducible requirements that parents must provide for their children. Parents who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have their parental rights terminated. *In re K.Z.S., supra; In re B.L.L.*, 787 A.2d 1007 (Pa. Super. 2001).

There is no simple or easy definition of parental duties. However, the appellate cases make it very clear that parenting is an active rather than a passive obligation that, even in the face of difficulty, adversity, and incarceration, requires a parent to take and maintain a place of importance in the child's life. The following passage is instructive:

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> * * *
>
> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

14

*In re K.Z.S., supra* at 759. *See also In re Burns*, 379 A.2d 535 (Pa. 1997); *Adoption of Baby Boy A. v. Catholic Social Services of the Diocese of Harrisburg*, 517 A.2d 1244 (Pa. 1986); *In re Shives*, 525 A.2d 801 (Pa. Super. 1987).

In relation to the parental requirements outlined in Section 2511, when a parent is separated from his or her child, it is incumbent upon the parent "to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life." *In re G.P.-R.*, 851 A.2d 967, 977 (Pa. Super. 2004). When a parent has abandoned or effectively abandoned a child,

> [t]o be legally significant, the post abandonment contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to understand the parental role. *The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.*

*In re T.D.*, 949 A.2d at 919 (case citations and brackets omitted) (emphasis in original). Finally, parents are required to make diligent efforts towards assumption or resumption of full parental responsibilities. Accordingly, a parent's vow to cooperate, after a long period of being uncooperative regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *In re Adoption of K.J., supra; In re A.L.D.*, 797 A.2d 326 (Pa. Super. 2002).

Once statutory grounds for termination have been established, the court must, in accordance with Section 2511 (b), consider whether the child's needs and welfare

15

will be met by termination. A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. Intangibles such as love, comfort, security, and stability are involved in the inquiry. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond, if any, between parent and child. If a bond is determined to exist, the effect on the child of permanently severing the bond must be analyzed and considered. *See In re K.M.,* 53 A.3d 781 (Pa. Super. 2012); *In re T.D., supra; In re L.M., supra; In re Adoption of R.J.S., supra.* As to the bond analysis, the Superior Court has stated:

> In conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.,* 946 A.2d 753, 764 (Pa. Super. 2008).

*In re K.H.B.,* 107 A.3d 175, 180 (Pa. Super. 2014).

In addition to a bond examination, a court may equally

> emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent-child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

16

*In re K.Z.S.*, 946 A.2d at 763 (emphasis in original).

When, as here, the petitioner is an agency, "it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b). However, the existence or absence of a pre-adoptive home is an important factor. So is the relationship between the child and the foster or pre-adoptive parents. As our Supreme Court cogently stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. *In re: T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). *See In re K.M., supra.*

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated:

> [I]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.' 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include '[i]ntangibles such as love, comfort, security, and stability. In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993) ], this Court held that the determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention'" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.* 71 A.3d at 267. The Court additionally observed:

> contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency

17

determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved....Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. ASFA was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children.

*In re T.S.M.*, 71 A.3d at 269.

In these cases, Father has been incarcerated for the entire time that that the Children have continuously been in the care of others. Incarceration, standing alone, neither constitutes sufficient grounds for termination of parental rights nor removes the obligation to perform required "bond effects" and "needs and welfare" analyses.

18

However, it is a factor that must be considered and, in a proper case, such as when a parent is serving a prohibitively long sentence, may be determinative. *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012); *Z.P.*, 994 A.2d at 1120. "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind…that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what [he or] she is supposed to be doing in prison." *In re E.A.P.*, 944 A.2d at 84.

The analysis depends in part on the asserted grounds for termination. In subsection (a)(1) abandonment cases, our Supreme Court has stated:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re Adoption of S.P.*, 47 A.3d at 828 (quoting *In re Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975) (footnotes and internal quotation marks omitted). Thus, in an abandonment case, a parent is required to *both* utilize available resources *and* take affirmative steps to support a parent-child relationship. If the parent fails to do so, his or her parental rights may be terminated. *See In re Adoption of W.J.R.*, 952 A.2d 680 (Pa. Super. 2008); *In re E.A.P., supra; In re K.J., supra.* However, utilization of available resources does not guarantee preservation of parental rights. The statutory

criteria, the facts and circumstances of each case, and the best interests, needs, and welfare of the child must all still be considered.

In cases involving parental incapacity, our Supreme Court recently held that:

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P*, 47 A.3d. at 828. In more expanded terms, the Supreme Court stated:

> In line with the expressed opinion of a majority of justices in *In re R.I.S.*, 614 Pa. 275, 36 A.3d 567 (2011), our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*Id*. at 830. In sum, a parent's incarceration "is relevant to the subsection (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the "essential parental care, control or subsistence" that the section contemplates." *In re A.D.*, 93 A.3d at 897.

Finally, before filing a petition for termination of parental rights, the Commonwealth is generally required to make reasonable efforts to promote

20

reunification of parent and child. *In re Adoption of R.J.S..* See also *In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). However, the Commonwealth does not have an obligation to make reunification efforts indefinitely.

> The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. When reasonable efforts to reunite a foster child with his or her biological parents have failed, then the child welfare agency must work toward terminating parental rights and placing the child with adoptive parents. The process of reunification or adoption should be completed within eighteen (18) months. While this time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re Adoption of R.J.S.*, *supra* at 507 (internal case citations, quotation marks, and footnote omitted).

Additionally, the failure of an agency to make reasonable efforts to promote reunification of parent and child will not defeat a properly supported petition for termination of parental rights. Neither the relevant provisions of Section 2511 nor the pertinent provisions of the Juvenile Act require a court to consider the reasonable efforts provided to a parent by the petitioning agency prior to termination of parental rights. *In re D.C.D.*, 105 A.3d 662 (Pa. 2014); *In re Adoption of C.J.P.*, *supra.* In *In re D.C.D.*, our Supreme Court

> analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that, while

21

"reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. *Id.* at 671–75 (citation omitted). The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child. *Id.* at 676–77. While the Supreme Court in *D.C.D.* focused its analysis on Section 2511(a)(2), we find the Supreme Court's reasoning equally applicable to Section 2511(a)(8). Like Section 2511(a)(2), nothing in the language of Section 2511(a)(8) suggests that reasonable reunification services are necessary to support the termination of parental rights.

*In re Adoption of C.J.P.*, *supra* at 1055. Thus, while agencies must provide reasonable efforts to enable parents to work toward reunification with their dependent children when ordered to do so, "the remedy for an agency's failure to provide services is not to punish an innocent child, by delaying her permanency through denying termination, but instead to conclude on the record that the agency has failed to make reasonable efforts, which imposes a financial penalty on the agency of thousands if not tens of thousands of dollars under federal law." *In re D.C.D.*, 105 A.3d at 675.

In his Rule 1925(b) statements in these cases, Father first contends that we erred by finding that CYS proved statutory grounds for termination of his parental rights. Under the facts of these cases and the law summarized above, this assignment of error lacks merit.

The Children have been dependent and continuously in the care of CYS and their current foster family since April of 2017. Specifically, as of the termination hearing, the Children had been in care for seventeen months. Their time in care far exceeds the minimum time requirements – 6 months and 12 months – of the statutory

22

termination provisions cited by the Agency. Their time in care was also at the back end of the 18 months within which Courts and child welfare agaencies must achieve permanency for dependent children. There is and can be no question that the pertinent time requirements have been satisfied.

Moreover, Father failed to perform parental duties for nearly two years and, even before he was incarcerated, demonstrated a lack of capacity to perform parental duties, an inability to handle the Children's needs, and an inability to keep the Children and others around them safe.

Further, the conditions that caused the Children to come into care remain. Among other things, Father is still incarcerated. In this regard, as of the termination hearing, Father had been incarcerated for 23 months and was not eligible for parole for another three years. Relatedly, as of now, Father has no specific housing or release plan and his hoped-for post-release employment is speculative at best.

Father has not seen the Children at all during their dependency. Similarly, he has had only minimal contacts with them consisting of a handful of phone calls and a single card written to each of them. Moreover, and very significantly, Father has done nothing to promote the mental, physical, spiritual, or emotional well-being of the Children. Rather, since their removal, foster parents – not Father – have provided nurturing and care for the Children and have insured that their physical, mental, emotional, medical, developmental, and daily needs have been met.

In finding that Father failed or refused to perform parental duties, that the circumstances that caused the Children to come into care remain, that Father has done nothing to ensure their mental, physical, and emotional well-being and

23

development, and in terminating Father's parental rights, we considered but did not place undue emphasis on Father's incarceration. Rather, in accordance with the law recited above, we considered Father's past and current periods of incarceration, the remaining length of his sentence, the subsequent period that he will be under state supervision, the impact his incarceration has had on the Children, the degree to which his incarceration incapacitated him from performing parental duties under both the general and statutory meanings of that term, and his previously-referenced failure to take meaningful steps to remain in the Children's lives while in jail.

Finally, as discussed below, termination of Father's parental rights satisfies the needs, welfare, and best interests of the Children.

Under these circumstances and the evidence presented at hearing, it was clear to us that CYS established grounds for termination of Father's parental rights to the Children under subsections 2511(a)(1), (2), and (8). It is just as clear to us now.

With respect to the bond effects and needs and welfare analyses required by Subsections (a)(8) and (b), it was and remains clear to us that the best interests and welfare of the Children require that Father's parental rights be terminated.

Father expressed his love for the Children. However, it is well settled that a parent's own feelings of love and affection for a child, standing alone, does not prevent termination of parental rights. In re Z.P., 994 A.2d 1108 (Pa. Super. 2010); In re L.M., 923 A.2d 505 (Pa. Super. 2007). This is especially true when, as here, the expression is not backed up by facts, history, conduct, or action.

The Children have been living almost two years without Father. More precisely, they have been living without either parent. The Children need and deserve

24

permanency, stability, love, support, and parental care. Their needs have not been met by Father. Others have provided parenting for the Children while Father did not. He has not reached out from prison in any meaningful way, and will not physically be available as a parent until at the earliest August of 2021. Further, nothing in the record suggests that Father will be able to meet the Children's needs in the future, especially considering his criminal history, his remaining sentence, his subsequent lengthy period of supervision, and his current lack of a release plan. Given the facts presented at hearing, and considering Father's history, we found that the Children's lives simply could not and should not be put on hold in the hopes that Father, after making parole or maxing out on his sentence at some point in the future, will summon the ability to handle the responsibilities of parenting while turning his back on his criminal tendencies, finding and maintaining stable and suitable housing and a job, and for the first time properly caring for three Children.

There appears to be little to no bond between the Children and Father. This is especially clear as to N.B. who was only one when Father was arrested and went to jail for two months and 2 ½ when he started serving his current sentence. It is even more obvious as to M.B. who was only eight months old when Father went to jail. As to B.B., the bond appears to be a negative one as B.B. remembers Father as someone who abused Mother. It is also evidenced by the fact that the Children did not want, and have not missed, visitation with Father. Simply, given the facts and circumstances of this case and Father's history, there is little if any bond between Father and the Children and what bond there is does not appear to be healthy. Thus, severing whatever bond exists, will not adversely affect the Children.

On the other hand, the Children are bonded with their foster family, two of whom wish to adopt them. The Children's foster Family have been there for them, have provided for them, have loved and cared for them, and want to become their forever family. The bond that has developed between the Children and their foster family is a healthy one, the severance of which would be extremely detrimental to the Children.

Simply, under the facts and circumstances of this case, we found that termination of Father's parental rights so that the Children may be adopted by members of their foster family would best serve the developmental, physical, and emotional needs and welfare of the Children and promote their best interests. We stand by our decision.

In his second assignment of error, Father asserts that we failed to make reasonable efforts toward reunification with paternal grandmother despite Father's clear and settled purpose to have his mother care for the children." This assertion may be disposed of quickly.

Initially, as discussed, reasonable efforts at reunification with a parent are not required before a *parent's* parental rights are terminated under Section 2511(a)(2) or (8) and the failure of an agency to make reasonable efforts to promote reunification of parent and child will not defeat a properly supported termination petition. In *In re D.C.D., supra; In re Adoption of C.J.P.* Given this settled law, it follows that reasonable efforts to "reunify" with a grandparent are not required before a partent's parental rights may be terminated. We believe this is especially true in cases where, as here, the grandparent's son or daughter (the child's parent) is incarcerated.

26

Additionally, and in any event, Paternal Grandmother was not a current resource for the reasons discussed above, including the fact that the ICPC had not been approved and that she had not seen or visited the Children since they came into care.

Finally, even if the ICPC had been approved, and despite the general preference to keep children with appropriate willing family members when possible, under the facts and circumstances of this case we would not have chosen Paternal Grandmother over the Children's foster family. As discussed, a bond has developed between the Children and their foster family. Severing that bond would be detrimental to the Children. In contrast, there was no evidence of a similar current bond between the Children and Paternal Grandmother. Father's "clear and settled purpose to have his mother care for his children" has not been enough to prompt Paternal Grandmother to visit the Children or call them more than a few times, and has similarly not been enough to prompt Father to reach out to the Children from prison and maintain a place in their lives. Under these circumstances, there is an can be no error or abuse of discretion in choosing foster parents over Paternal Grandmother.

In sum, we found that CYS proved statutory grounds for termination of Father's parental rights by clear and convincing evidence. We further found that the Children's needs and welfare are best served by termination of Father's rights so that the Children may be adopted by members of their foster family. We remain convinced that

27

our decisions are supported by both the facts and the law, and, moreover, fulfilled and advanced the best interests of the Children.

BY THE COURT:

Date: 12-4-2018

_____
Jonathan Mark, J.

Cc:   Superior Court of Pennsylvania
Jonathan Mark, Judge
Brandie Jean Belanger, Esq.
Barbara Fitzgerald, Esq.
Elizabeth B. Weekes, Esq.
Brian Gaglione, Esq.

Clerk of Courts
DEC 4 '18 PM 1:17

28