J-S25017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.K. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.T., MOTHER | : | |
| | : | |
| | : | No. 139 WDA 2022 |

Appeal from the Order Entered January 3, 2022
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-21-0815

| | | |
|---|---|---|
| IN RE: A.W. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.T., MOTHER | : | |
| | : | |
| | : | No. 140 WDA 2022 |

Appeal from the Order Entered January 3, 2022
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-21-0817

BEFORE:  BENDER, P.J.E., DUBOW, J., and KING, J.

MEMORANDUM BY DUBOW, J.:          **FILED: SEPTEMBER 14, 2022**

A.T. ("Mother") appeals from the January 3, 2022 orders that involuntarily terminated her parental rights to M.K., born in October 2019,

and A.W., born in September 2015 (collectively, "Children").[1] Because the record supports the decision of the trial court, we affirm the orders.

We glean the following factual and procedural history from the trial court's Opinion and the certified record.  In November 2018, Washington County Children and Youth Social Service Agency ("CYS") became involved with this family due to concerns regarding drug use and domestic violence. Additionally, the home where Mother and Father lived with Children was dirty with no furniture, and only an air mattress. CYS recommended that Mother attend parenting education, obtain a drug and alcohol evaluation, and engage in an intervention group, but Mother failed to participate.

Between January 2019 and August 2019, police and CYS were dispatched to the home at least four times due to reports of domestic violence, drug use, and drug sales from the home. In late August 2019, following an emergency shelter proceeding, the court ordered A.W. removed from the home and placed in the physical custody of A.W.'s then-presumptive father.

In October 2019, CYS received a report alleging that Mother tested positive for illegal substances while pregnant with M.K.  In December 2019, CYS became aware that Mother had been involved in another incident of domestic violence with Children present at the home of Jamila Toure.[2]  These

_____

[1] The court also terminated the parental rights of the father of M.K. ("Father") and unknown father's rights to A.W.  Father is not a party in this appeal.

[2] Notably, Mother has an extensive history of domestic violence with both Father and Ms. Toure, the mother of one of Father's other children.

incidents resulted in criminal charges against Mother, including harassment and attempted burglary.

On December 4, 2019, A.W.'s then-presumptive father returned A.W. to Mother's care. Subsequently, he was excluded as A.W.'s father through paternity testing and he rescinded his acknowledgment of paternity.

On December 23, 2019, CYS removed Children, who were then 2 months old and 4 years old, respectively, and on January 3, 2020, the court adjudicated Children dependent. CYS placed them in foster care. They have been together in the same foster home since April 2020.

The court initially established a goal of reunification and ordered that Mother have weekly supervised visits with the Children. In addition, the court ordered Mother to complete domestic violence counseling, parenting education, and a mental health assessment and follow all recommendations. The court also ordered Mother to submit to random drug and alcohol testing and obtain appropriate housing.

In 2020 and 2021, Mother was incarcerated on several occasions for, *inter alia*, incidents of domestic violence.

In 2020, when Mother was not incarcerated, the dependency court found that Mother had "moderate compliance with the permanency plan" and had "made moderate progress in alleviating the circumstances which necessitated original placement." Tr. Ct. Op., filed 1/3/22, at 7. However, just three months later, in December 2020, the court found Mother "to have little compliance with the permanency plan and no progress toward alleviating

circumstances" because Mother had been discharged from dual diagnosis treatment due to noncompliance and failure to attend, had failed to appear for random drug testing, and was not making progress in parenting education due to inconsistency with visitation. *Id*. at 7-8. Further, Mother continued to have contact with Ms. Toure despite having completed domestic violence counseling. Mother was again incarcerated in February 2021.

On May 3, 2021, CYS filed petitions to involuntarily terminate Mother's parental rights to Children.[3] The trial court held hearings on the petitions on September 9, 2021, September 27, 2021, and October 8, 2021, when Children were approximately two and six years old.[4]

CYS presented the testimony of, among others, caseworker, Deanna Bevan; psychologist, Neil David Rosenblum, Ph.D.;[5] and Children's Institute Family Skills Specialist, Matthew Stromeyer. Mother, represented by counsel, testified on her own behalf, acknowledging her general non-compliance with services, her failure to address her depression and bipolar disorder until she was incarcerated from May 2021 to June 2021, and her struggles in parenting the Children.

_____

[3] With its petitions, CYS also sought to involuntarily terminate Father's parental rights to M.K. and any unknown father's parental rights to A.W.

[4] Children were represented by Frank Kocevar, Esquire, as legal counsel. Father, represented by counsel, testified on his own behalf.

[5] Dr. Rosenblum conducted various individual and interactional evaluations involving the parties. His reports relevant to Mother were marked and admitted as CYS Exhibits 10 & 13 and Mother's Exhibits A-1, A-2, & A-3.

On January 3, 2022, the trial court issued an Opinion and Order of the Court, which granted CYS's petitions and terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The court found, *inter alia*, that Mother "has consistently and historically had low or no progress in alleviating circumstances leading to placement" and "failed to maintain an upward trajectory of progress," noting that "despite availing herself of services, such activity was inconsistent and largely ineffective." Tr. Ct. Op. at 15-16. Additionally, the court observed that Mother remained incarcerated at the time of its decision. *Id.* at 12 n.5.

Mother filed timely Notices of Appeal and Concise Statements of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). In lieu of a Rule 1925(a) opinion, the trial court relied on its January 3, 2022 Opinion and Order of Court.

In her brief, Mother raises the following issues for our review:

1. Did the trial court commit an error of law in finding that [CYS] submitted clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), (a)(5), and (a)(8)?

2. Did the trial court commit an abuse of discretion in failing to adequately consider domestic violence, mental health, and COVID's role in prohibiting Mother from complying with services?

3. Did the trial court commit an abuse of discretion in failing to adequately consider the effect that termination of parental rights would have on the children and their emotional bond with Mother, as analyzed under 23 Pa.C.S. § 2511(b)?

Mother's Br. at 4.

- 5 -

**A.**

Our standard of review is well settled. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). Appellate courts must accept the trial court's findings of fact and credibility determinations if the record supports them. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). An appellate court may disturb a ruling supported by competent evidence in the record only upon discernment of an error of law or abuse of discretion. *In re Adoption of L.A.K.,* 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

When addressing a petition to involuntarily terminate parental rights, the Adoption Act requires the trial court to conduct a bifurcated analysis. 23 Pa.C.S. §2511(a) and (b). Section 2511(a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant

involuntary termination. If the trial court determines that the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court must then assess the petition under Section 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); 23 Pa.C.S. § 2511(b).

**B.**

While the trial court here found that CYS met its burden of proof under multiple subsections of 23 Pa.C.S. § 2511(a), we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on Section 2511(a)(2).

In her first two issues, Mother avers, *inter alia*, that the trial court abused its discretion when it terminated her parental rights pursuant to Section 2511(a)(2). Mother argues that the court "failed to consider the efforts [she] made to alleviate incapacity." Mother's Br. at 33. She contends that the court did not consider "the abuse and mental health issues [she] suffered" and the amount of time she needed to remedy the causes of incapacity. *Id.* Mother also asserts that the court ignored "the lack of assistance provided by the Agency" and contends that the COVID-19 pandemic, in combination with domestic violence incidents and mental health challenges, "inhibited her ability to comply with all court-ordered services." *Id.* at 33, 38.

Section 2511(a)(2) provides that a parent's right to her child may be terminated where "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2). *See also Interest of D.R.-W.*, 227 A.3d 905, 912-13 (Pa. Super. 2020) (reiterating the three elements contained within Section 2511(a)(2)). Grounds for termination under subsection 2511(a)(2) include more than affirmative misconduct and acts of refusal; it also includes parental incapacity. *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021).

Subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d at 443. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d at 1118. "Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of [her] . . . ability, even in

difficult circumstances." *Id.* (citation omitted). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs." *Id.* (citation, emphasis omitted).

It is well settled that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing 'essential parental care, control or subsistence' and the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2)." *In re Adoption of S.P.*, 47 A.3d 817, 830-31 (Pa. 2012). Moreover, a parent's repeated pattern of criminal activity coupled with a failure to comply with court-ordered goals may satisfy the requisites of incapacity, abuse, neglect or refusal. *In re Adoption of W.J.R.*, 952 A.2d 680, 687 (Pa. Super. 2008).

Here, the trial court concluded that Mother lacked the capacity to provide essential care and control for Children because she failed to progress and comply with court-ordered services and continued to engage in criminal activity. The court opined:

> The Children in the present matter have had no stability in excess of 23 months. While Mother has been consistently inconsistent in her compliance and participation, . . . Mother ha[s] had repeated periods of incarceration. All the while, the [] Children remain out of the care of [Mother] and in foster placement where they are reportedly flourishing. The failure of parents to progress and fully comply with [c]ourt ordered services, the continued criminal

activity of parents[,] and the recurring issues of domestic violence, have led these two (2) [] [C]hildren to be without essential parental care, control or subsistence necessary for the mental well-being and the parents have no remedied the causes for such absence. Accordingly, the Agency has met its burden of establishing the elements of § 2511(a)(2) by clear and convincing evidence.

Tr. Ct. Op.at 12-13 (footnote omitted).

Our review of the record supports the trial court's finding of Mother's incapacity to parent Children. The presented evidence demonstrated that Mother was unable to participate in certain services or in-person visits while Mother was incarcerated, that is, from March 5, 2020 to June 18, 2020, February 3, 2021 through February 18, 2021 and May 3, 2021 to June 23, 2021.. N.T., 9/9/21, at 27-28, 73-74. **See also** CYS Exhibits 11, 12, & 14. During her periods of release, however, Mother failed to complete the services required for reunification.[6] **Id.** at 23-27, 32-34, 74, 94.

Most notably, Mother failed to complete services required to address her mental health. Despite having been diagnosed with significant de-stabilizing mental health disorders,[7] Mother did not complete required intensive outpatient treatment. N.T., 9/9/21, at 33. Pyramid Healthcare discharged Mother twice due to her inconsistent participation and, although Mother re-

_____

[6] Mother acknowledged a lack of consistency with her services, indicating issues with her mental health as well as transportation.

[7] Dr Rosenblum diagnosed Mother with bipolar 1 disorder; post-traumatic stress disorder; history of cannabis use disorder; unspecified disruptive impulse control and conduct disorder; personality disorder with borderline narcissistic and antisocial behavior; history of relationship distress with spouse or intimate partner; and parent-child relational problems. N.T., 9/27/21, at 12.

engaged in mental health services through Southwestern Pennsylvania Human Services, Inc. ("SPHS"), her participation was again inconsistent. *Id.* at 33-34, 74-79; *see also* CYS Exhibit 12; *see also* Mother's Exhibits A-4 & A-5.

The evidence demonstrated that Mother's mental health diagnoses impacted her ability to parent "very significantly." N.T., 9/27/21 at 12-13. After acknowledging Mother's failure to improve her parenting skills, Dr. Rosenblum testified, "the issue is far more than her parenting skills. The issue quite clearly is the lack of mental health stability, [and] the difficulties with her relationships or impulse control." *Id.* at 18. In Dr. Rosenblum's expert opinion, Mother's prognosis for achieving more stability in her life is "not very good." *Id.*

Additionally, Mother never progressed to unsupervised visitation and failed to consistently attend supervised visits with Children, attending only 53 out of 84 scheduled visits. N.T., 9/9/21, at 27-28; N.T., 10/8/21, at 169. **See also** CYS Exhibit 14. When she did attend, she was generally attentive to Children's needs; however, there were times when Mother brought other people to the visits, including Ms. Toure, and frequently talked on her cellphone during visits. N.T., 9/9/21, at 23-24, 35, 56, 83-89. **See also** N.T., 9/27/21, at 103, 111. While Mother completed the requisite parenting workbook associated with her parenting program, "it took . . . the entire life of the case to complete" it. N.T., 9/9/21, at 23. Finally, Mother failed to complete the program at Parent-Child Interactional Therapy that Dr.

Rosenblum recommended. Because Mother failed to appear consistently, the facility discontinued services for Mother. *Id.* at 33-34, 72.

Having reviewed the record, we conclude it supports the findings of the trial court that Mother has not provided Children with essential parental care, control, and subsistence necessary for their mental and physical well-being, and that Mother is unable to remedy the causes of her parental incapacity, neglect, or refusal any time in the foreseeable future.

Mother argues that the trial court failed to consider that her mental health challenges posed a barrier to her completing court-ordered services. That is, however, exactly the type of scenario that termination pursuant to Section 2511(a)(2) contemplates.

Mother further argues that the trial court should have given her more time to complete the court-ordered services. This proposition, however, is contrary to established case law that "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs." *In re Z.P.,* 994 A.2d at 1118.

Mother also argues that the "COVID-19 pandemic impacted the efficacy of services and visitation." Mother's Br. at 38-39. With respect to the pandemic's impact on Mother's ability to visit with the Children, the trial court properly found that COVID quarantine requirements had only occasional

impact on her visits with Children. N.T., 10/8/21, at 136, 140-41.[8] Additionally, the trial court's decision to terminate Mother's parental rights was based primarily on Mother's untreated mental health issues and not on Mother's infrequent visitation with the Children.

With respect to Mother's argument about the pandemic's impact on Mother's access to services, Ms. Bevan acknowledged some communication difficulty or delay as a result of precautions during the pandemic, but also testified that these issues did not impact Mother's ability to obtain services in the normal or alternative formats, such as video conferences and visits. N.T., 9/9/21, at 51. In fact, Mother testified that it was her struggles with mental illness and incarceration that were the specific obstacles that impacted her non-compliance with services. *Id*. at 138-39.

As the trial court observed, Mother "has consistently and historically had low or no progress in alleviating circumstances leading to [Children's] placement[,] . . . has not regularly complied with all court ordered services, and [ ] failed to maintain an upward trajectory of progress." Tr. Ct. Op. at

---

[8] The trial court "found concerning testimony of Mother that she went to the beach and was unable to see [ ] Children as a result of COVID restrictions. More concerning, Mother had only recently been released from prison when she made this travel decision." Tr. Ct. Op., at 15 n.8. The trial court did not otherwise acknowledge that COVID had any impact on Mother's ability to obtain services.

15. The record supports the trial court's conclusions and we reject Mother's challenges to them.[9]

## C.

In her final issue, Mother avers that the trial court abused its discretion when it terminated her parental rights pursuant to Section 2511(b). Mother argues that the evidence demonstrates that a bond exists between her and Children, and the trial court failed to adequately consider the effect of severing that bond. Mother's Br. at 39. Mother further argues that the trial court erred in crediting Dr. Rosenblum's "speculative" bond testimony over her own testimony that severing the bond between her and Children would be detrimental to Children and result in their severe emotional damage. *Id.* at 40.

With respect to Section 2511(b), we conclude that the trial court properly determined that termination of Mother's parental rights would be in the best interests of Children. Section 2511(b) provides that the court must

---

[9] To the extent Mother raises an assertion of a lack of reasonable efforts on the part of CYS, this argument is without merit. When reviewing a termination order on appeal, courts are not required to consider reasonable efforts provided to a parent. *See In the Interest of: D.C.D.*, 105 A.3d 662, 672 (Pa. 2014) (concluding, "Neither subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights" and holding that while "the provision or absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child[,]" the provision of reasonable efforts is not a requirement for termination.). Further, Ms. Bevan confirmed that CYS extended "every available service" to help Mother alleviate the issues that necessitated the original placement. N.T., 9/9/21, at 39.

consider whether termination of parental rights would best serve Children's developmental, physical, and emotional needs and welfare. *See* 23 Pa.C.S. § 2511(b). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, *supra* at 1121. The court may equally emphasize the safety needs of the child and consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, *supra* at 103. Ultimately, the concern is the needs and welfare of a child. *In re Z.P.*, *supra* at 1121.

In concluding that the testimony supports the termination of parental rights under Section 2511(b), the trial court credited the testimony of Ms. Bevan and Dr. Rosenblum. Trial Ct. Op. at 17-20. The court emphasized that Ms. Bevan "testified that [Children] were bonded with their Mother, but also 'extremely attached' with their foster parents. [Ms.] Bevan opined that any such bond between [Mother] and [] Children was not worth preserving in consideration of the 20 month history of the case." *Id.* at 18. Critically, Ms. Bevan opined that it was in Children's best interests to terminate parental rights because they had been in care for 20 months, are extremely attached to their foster parents, and need permanency. N.T., 9/9/21, at 36-37, 91-92.

In addition, the court emphasized and found persuasive the testimony of Dr. Rosenblum. Specifically, the trial court placed great weight on Dr. Rosenblum's testimony that Mother's mental health and substance abuse issues create instability and that Mother's prognosis is "'not very good.[;]"

- 15 -

that A.W. has an attachment to Mother but the relationship is not a "healthy, constructive or a beneficial relationship[;]" that M.K. is "familiar" with Mother, but has a primary attachment to foster parents; that the "benefits of adoption would outweigh severing the bond for any of the parents." *Id.* at 18-19. Further, the court considered Mother's unstable lifestyle and its impact on her bond with Children. The court opined:

> [Dr.] Rosenblum pointed to the start and stop of treatment, changing relationships, changing residences and employment, abuse of drugs and troublesome mental health diagnoses in support of his opinion. Dr. Rosenblum noted that Mother has acknowledged her criminal history and stated that Mother has "severe problems with anger and self-control and she can't rein that in, even when dealing with the most important things in her life." In response to impact on the children, [Dr.] Rosenblum repeated his opinion that **termination of parental rights would have little impact with M.K.; while testifying that A.W. "would have some emotional adjustment, but not distress from termination of parental rights."** [Dr.] Rosenblum testified that for A.W., preservation on her relationship with Mother has become far less essential and meaningful over the last two (2) years. According to [Dr.] Rosenblum, A.W. relies upon her foster parents for family, community and basic needs and termination of [Mother's] parental rights would be most beneficial for the [m]inor [c]hild. This testimony supports termination under § 2511(b) as requested by [CYS].

*Id.* at 19-20 (emphasis in original; footnote omitted).

It is well-settled that the trial court is free to believe all, part, or none of the evidence. Mother's argument that the trial court should have placed more weight on her testimony is a request for this court to reweigh the evidence. We decline to do so.

Our review of the record supports the trial court's findings. We do not discern an error of law or abuse of discretion with respect to the court's conclusion. Thus, we affirm the court's determination that the involuntary termination of Mother's parental rights is in the best interests of Children.

**D.**

In sum, we find that the record supports the trial court's findings and conclusions, and we affirm its orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/14/2022